In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3061

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAMES G. SWANSON,

Defendant-Appellant.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-CR-25-S--John C. Shabaz, Chief Judge.


Argued February 24, 2000--Decided April 24, 2000



  Before POSNER, Chief Judge, and CUDAHY and EVANS,
Circuit Judges.

  EVANS, Circuit Judge.  One issue on this appeal
presents an interesting question: Do "dead"
marijuana plants add up to trouble for a
defendant under the federal sentencing
guidelines?

  When officers from the Sauk County sheriff's
department executed a search warrant at James
Swanson's residence in Spring Green, Wisconsin,
they discovered an impressive marijuana-growing
operation. The evidence seized led to a federal
charge alleging possession with intent to
manufacture marijuana.

  Swanson tried, unsuccessfully, to suppress the
evidence obtained from the search. Afterwards, he
entered a conditional guilty plea to the charge
and was sentenced to a term of 42 months in
prison. He appeals, alleging that the police
intentionally or recklessly included false
information in the affidavit which led the state
judge to issue the search warrant. Failing that,
he claims that the search warrant was not
supported by probable cause. Finally, he tags on
an interesting sentencing issue, arguing that
remnants of marijuana plants--dead plants, he
says--found on his property should not have been
included in determining the size of his weed-

growing operation.

The search warrant issues can be quickly brushed aside. The search warrant was issued in reliance on the detailed, four-page, single-spaced affidavit of Detective Tom Meyer, a 15-year law enforcement veteran with substantial experience in investigating drug cases. Contrary to Swanson's alternative argument that the affidavit contains no probable cause, we find, despite some minor flaws, that it's brimming with it. So we move to the claim that material misstatements intentionally or recklessly crept into Meyer's affidavit.

Franks v. Delaware, 438 U.S. 154 (1978), sets out the standards for challenging the validity of search warrants obtained with the help of factual misrepresentations, usually in affidavits but sometimes in sworn testimony. To obtain a hearing here, dubbed a Franks hearing after 1978, Swanson had to establish by a "substantial preliminary showing" that: (1) the affidavit contained a false material statement; (2) the affiant made the false statement intentionally, or with reckless disregard to the truth; and (3) the false statement is necessary to support the finding of probable cause. 438 U.S. at 155-56; United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984). These elements are hard to prove, and thus Franks hearings are rarely held.

Swanson's attacks here amount to little more than throwing pebbles at a tank. He makes several weak claims but we will mention only a few. First, he says Meyer provided misleading information because he failed to tell the issuing judge that Swanson's residence was bigger than a neighbor's residence used for purposes of comparing electrical use. Second, he alleges false and misleading statements about his tax returns were included in the affidavit. Also, he cites "misleading" statements about his real estate--omitting the fact that his $609,917 property was encumbered by a $508,000 mortgage.

A lot of heat, and thus electricity, is needed to grow marijuana, and Detective Meyer reported that he obtained energy usage records for Swanson's residence. Those records revealed that Swanson's average monthly use of electricity increased every year from 1994 through 1998, starting at 1,443 kilowatt hours per month, progressing to 2,347 kwh/month, 5,057 kwh/month, and 6,804 kwh/month. In 1998, Swanson averaged 9,615 kwh/month. Meyer contrasted this electrical use with that of an unidentified neighbor of Swanson's who averaged only 1,408 kwh/month in 1997 and 1,424 kwh/month in 1998. This information tended, if ever so slightly, to show

that something other than TV dinners were cooking at Swanson's.

In another part of his affidavit, Detective Meyer reported that a different state agent reviewed Swanson's tax returns for 1995-1997. In those returns, Swanson identified himself as an "operative builder." Swanson had no W-2's. In 1995, while living at a different residence in Spring Green, Swanson declared an adjusted gross loss of $8,531, with inventory at $257,909. In 1996, Swanson declared an adjusted gross income of $3,586, with an ending inventory of $229,429. In 1997, Swanson reported an adjusted gross income of $46,197, with a year-end inventory of $239,681. Swanson's return for 1997 also revealed mutual fund investments generating $1,989 in income.

Detective Meyer reported that he had reviewed records of the Sauk County register of deeds which disclosed that Swanson's property had a fair market value of $607,917 in 1998. (Detective Meyer also reviewed Wisconsin DOT records which indicated that Swanson owned a 1954 Dodge truck, 1965 Porsche, 1967 Land Rover, 1989 Ford truck, and a 1998 Audi station wagon.) No mortgage on the real property was reported.

As to the abnormally high electricity used on the Swanson property, he has a point, although it is a minor one at best. Swanson's property was bigger than his neighbor's. But the lack of a comparison only lessens the weight of the allegations. If Meyer had intentionally said the properties were the same exact size, when they really were materially different, we would have something closer to a Franks violation. Because no comparison is explicitly stated, the allegation ceases to be particularly useful in establishing probable cause. And an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a Franks hearing.

As for the tax records, Swanson argues that Meyer misled the issuing judge because he failed to include all of the information from the tax returns. But there is no evidence to suggest that Meyer intentionally withheld additional information to trick the judge. The failure to include more information, which would have given a more complete picture of Swanson's "business" and thus shed more light on whether or not it was a "front" for an illegal operation, is little more than negligence. And negligence is no basis for convening a Franks hearing.

Finally, nothing in Swanson's offer of proof shows that Detective Meyer knew about the

mortgage on the property and disregarded or hid it from the issuing judge. In essence, then, Swanson is saying that the investigators should have done more work. This, however, is not the high standard required for convening a Franks hearing. Swanson simply fails to explain why the district court's finding on this issue that "there is no evidence that the police learned this information and then failed to include it in the affidavit; any failure to actually verify this point is at most negligence" is clearly erroneous. Finally, Detective Meyer accurately reported to the issuing judge the "fair market value" of the property owned by Swanson. He did not characterize this figure as a "net equity position."

We could go on and on, but what's the point? Nothing here suggests that a Franks hearing was required: At the very most, a little negligence was at work. But a little negligence--actually even a lot of negligence--does not the need for a Franks hearing make.

This brings us to the sentencing issue. The district court found that the search uncovered 408 "live" marijuana plants and 1,142 discarded, or "dead," plants. The judge added the two and applied the 1 plant equals 100 grams equivalency ratio under sec. 2D1.1(c) of the guidelines.

Swanson argues that the district court erred in two related ways. First, he asserts that it was error to find that the 1,142 dead plants were "marijuana plants." Because the 1,142 were merely "stalks," the argument goes, they are specifically excluded from the statutory definition of marijuana under 21 U.S.C. sec. 802(16). Second, Swanson asserts that it was error to include the 1,142 in the drug equivalency ratio because they were "dead" plants.

Marijuana is defined as "all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin," but "the mature stalks of such plants" are excluded from the definition. 21 U.S.C. sec. 802(16). For sentencing purposes, however, the guidelines take into account the total weight of marijuana, including the stalks. Section 2D1.1 provides that the weight of a controlled substance is determined by "the entire weight of any mixture or substance containing a detectable amount of the controlled substance." U.S.S.G. sec. 2D1.1(c), *Note (A).

The argument that the "stalks" should not be counted is doomed by United States v. Garcia, 925 F.2d 170 (7th Cir. 1991). There, we held that "stalks of the marijuana plant, although excluded from the guideline definition of marijuana, can still constitute part of a 'mixture or substance' containing a detectable amount of marijuana for the calculation of weight of the controlled substance seized." Id. at 173. See also United States v. Moreno, 94 F.3d 1453, 1456 (10th Cir. 1996) (marijuana stalks properly included in drug weight calculation); United States v. Vasquez, 951 F.2d 636, 637 (5th Cir. 1992) (same).

Alternatively, Swanson argues that only "live" plants can be used when applying the drug equivalency guideline, sec. 2D1.1(c). Although two circuits lend support to that position-- United States v. Stevens, 25 F.3d 318 (6th Cir. 1994), and United States v. Blume, 967 F.2d 45 (2d Cir. 1992)--the majority of the circuits which have addressed the point do not. They hold that the equivalency ratio of sec. 2D1.1(c) applies to all offenses involving the growing of marijuana, regardless of whether the plants are alive or dead. See United States v. Fitch, 137 F.3d 277, 281-82 (5th Cir. 1998); United States v. Layman, 116 F.3d 105, 109 (4th Cir. 1997); United States v. Shields, 87 F.3d 1194, 1197 (11th Cir. 1996); United States v. Silvers, 84 F.3d 1317, 1325-27 (10th Cir. 1996); United States v. Wilson, 49 F.3d 406, 410 (8th Cir. 1995); United States v. Wegner, 46 F.3d 924, 927-28 (9th Cir. 1995).

We have not directly ruled on the issue of whether the equivalency ratio applies to both live and dead plants seized at a marijuana grower's operation. However, in United States v. Haynes, 969 F.2d 569 (1992), we considered the closely related issue of whether the equivalency ratio should apply in a historical conspiracy where the government offered evidence of both the actual number of marijuana plants harvested in the past and the actual weight of the marijuana produced. Id. at 571.

In Haynes, the defendant was charged with conspiracy to manufacture and distribute over 1,000 marijuana plants. The number of harvested plants (which no longer existed) was 12,500. The amount of actual processed marijuana (which also no longer existed) was 400 kilograms. The defendant argued that he should be sentenced based only on the harvested marijuana amount of 400 kilograms,/1 rather than the 12,500 plant figure which, after application of the drug equivalency ratio, resulted in a drug weight of 12,500 kilograms and thus a higher sentencing range.

We held the defendant's sentence was properly pegged to the 12,500 kilogram amount based on the plain language of the equivalency provision in the guidelines. We observed that the guidelines clearly dictate that the actual weight figure, not the 100 grams to 1 plant ratio, is used only when the actual weight is higher. 969 F.2d 572.

The defendant in Haynes also argued that the district court could not use the 12,500 plant count because they did not exist anymore, and had in fact been converted into harvested marijuana. Again we rejected this argument, finding the plain language of the guidelines provision "contemplates that individuals who succeed in harvesting plants and processing marijuana therefrom are still considered to have committed offenses 'involving . . . marijuana plants.'" 969 F.2d 572.

On the issue of seized live versus dead plants, six other circuit courts of appeals have read Haynes to mean that we believe seized dead plants are counted for purposes of the 100 gram to 1 plant ratio set forth in U.S.S.G. sec. 2D1.1(c). See Fitch, 137 F.3d at 281-82; Layman, 116 F.3d at 109; Shields, 87 F.3d at 1196; Silvers, 84 F.3d at 1326; Wegner, 46 F.3d at 926; and Stevens, 25 F.3d at 322. Those circuits have correctly read our intentions. Today we explicitly so hold: dead or alive, all "plants" count.

For all these reasons, the judgment of the district court is AFFIRMED.


/1 In 1992, when Haynes was decided, the guidelines called for a ratio of 1 plant = 1 kilogram. The guidelines were changed to a ratio of 1 plant = 100 grams in 1995.