In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-4208 & 01-1882

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ROBERT MARO,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 635--Wayne R. Andersen, Judge.

Argued September 20, 2001--Decided November 8, 2001


    Before BAUER, MANION, and EVANS, Circuit
Judges.

    EVANS, Circuit Judge.  One of the
questions presented in this appeal is
whether Robert Maro is a "career
offender" under the United States
Sentencing Guidelines. What cannot be in
question, however, is that Maro is a very
unsuccessful serial robber of banks.

    Soon after his latest crime spree, Maro
was charged with two counts of bank
robbery, in violation of 18 U.S.C. sec.
2113(a):  one was a July 6, 1999, robbery
of the Firstar Bank in Geneva, Illinois;
the other was the August 20, 1999,
robbery of the First American Bank, also
in Geneva. After his motion to suppress
evidence was denied, he went to trial
before a jury, which convicted him on
both counts. His motion for a new trial
was denied, and he was sentenced to 210
months in prison. He appeals both his
sentence and the denial of his request
for a "Franks" hearing in regard to his
suppression motion.

    At trial, teller Jamie Nichols testified
that a white male, approximately 5' 7"
tall, with an average build, wearing a
baseball cap, a gray sweatshirt, jeans,
and sunglasses, approached her teller
window at the Firstar Bank. The man
pushed a checkbook cover toward her that

contained a post-it note stating, "Give me all your 50s and 20s now. I have a gun." The total take from the robbery was $1,900. Nichols identified Maro as the robber; she was "absolutely positive" of her identification.

First American Bank teller Susan Rosenstein said the person who robbed that bank was a white male a little taller than 5' 7" with a slight build and a mustache. He approached Rosenstein's teller window and held open a checkbook containing a note that stated: "Give me all your 50s, 20s, 10s, and 5s. This is a robbery. This is no joke. I have a gun." When Rosenstein hesitated, the robber made a gesture as though he were reaching for a gun. She then handed the robber a bundle of 20s totaling $500, as well as all of the loose 50s and 20s in her drawer. This time the robber obtained $1,830. The robber told Rosenstein to be quiet; he left the bank and began running.

At the same time, a very alert fellow named Michael Koehlar was working as a construction supervisor at a site across the parking lot from the bank. He testified that at approximately 1:20 p.m. he saw a person sprinting from the First American Bank into a nearby parking lot and then saw a red Ford Taurus driving from that section of the parking lot towards him. Koehlar testified that both the person he saw running from the bank and the driver of the Taurus were wearing white baseball caps and that the driver also had dark sunglasses and a large mustache that looked fake. Because Koehlar felt that the individual running from the bank and the "way he was driving" were suspicious, he focused on the car's license plate and recorded it on a piece of drywall at the construction site. Four minutes later, police cars pulled into the parking lot, and Koehlar advised them of what he had seen. He gave the police the number he recorded-- C863096--but he said he was not certain of the last three numbers. From a photograph, Koehlar later identified the defendant's car as the red Ford Taurus.

License plate number C863096 was not registered to a Ford Taurus, but when agents transposed the last two numbers recorded by Koehlar and traced C863069, they discovered that a 1993 Ford Taurus

was, in fact, registered in the name of the defendant, Robert Maro. Agents then investigated Maro's criminal record and learned that he had committed eight bank robberies in 1989, had been released from federal custody in September 1997, and was on federal supervised release. Agents also learned from Maro's probation officer that he was 5' 8" tall, 165 pounds, and 38 years old, with brown hair and brown eyes.

Special Agent Beth Mullarkey of the FBI filed a request for a search warrant for Maro's residence and car. The warrant was issued and FBI agents and Geneva police officers conducted a search of Maro's Ford Taurus, during which they recovered a post-it note in the glove compartment with some calculations on it and the number 1830--which was the exact dollar amount taken in the First American robbery. Maro's checkbook and check register were also found in the glove compartment; the register indicated that the defendant had written $2,300 in checks on the day of the First American robbery. Amazingly, deposit slips in the checkbook, notations in the check register, and Maro's bank records further showed $800 in cash deposits during the week after the Firstar robbery, a $700 cash deposit at 2:33 p.m. on the day of the First American robbery, and an additional $900 in cash deposits in the 4 days following the First American robbery. It was stipulated that Maro's ordinary income could not account for the cash deposits and that he had no other bank accounts.

From a pouch behind the passenger seat of the Taurus, agents recovered a false mustache, a bottle of spirit gum for applying the mustache, and a receipt indicating that the items were purchased between the time of the Firstar and First American robberies. Under the driver's seat, agents discovered a gray sweatshirt similar to the one worn in the bank robberies, together with baseball caps. In the spare tire compartment in the trunk, they found a pair of pants and another baseball cap. Maro was arrested.

Witnesses from the Firstar and First American Banks viewed a lineup. Nichols, the teller from Firstar Bank, positively identified Maro as the robber. At trial, she said she "recognized him so clearly

and [she] just knew it was him." Another witness from Firstar Bank, Stephan Nowak, was unable to make a positive identification but tentatively selected another participant in the lineup, an FBI agent, as the robber.

Before the teller from the First American Bank viewed the lineup, each participant glued on an identical false mustache. When teller Susan Rosenstein saw the lineup, she immediately recognized Maro as the robber. She testified that her heart began pounding when she saw him and that she was "totally positive of her identification."

Maro filed a motion to suppress the evidence and requested an evidentiary hearing, pursuant to Franks v. Delaware, 438 U.S. 154 (1978). The motion was denied, and that denial is the basis for one of Maro's grounds for appeal. We review a Franks request for clear error. United States v. Pace, 898 F.2d 1218 (7th Cir. 1980).

Maro contends that Special Agent Mullarkey's affidavit, filed in support of the request for the search warrant, knowingly contained false and misleading information and omitted witness descriptions of the robber which were inconsistent with Maro's appearance. Before trial, the district judge said that he did not think that "there was a false affidavit or that it was so inaccurate that the warrants were inappropriately issued." At a hearing on post-trial motions, the judge reaffirmed his earlier ruling that the evidence was properly admitted at trial. He indicated that he often held hearings on these issues but that Maro's motion was not even close to the kind that would trigger the need for a hearing:

With respect to the suppression hearing issue and whether or not the search should be suppressed, I am going to deny that motion for the same reasons that I previously did before the trial but also I am--I tend to--I tend to have hearings. If it is--if it is even within range, I like to have a hearing so that I can understand things and defendants get a fair shot at getting evidence suppressed.

In this case I felt there was so many similarities in terms of the descriptions

that there was a probable cause. I am not ignorant to the fact that meaningful evidence was discovered. But I--I think it was the correct decision at that point in time. And I am, around here, pretty liberal about giving hearings. So in this case I didn't think it was a good use of time.

In order to obtain a hearing, commonly called a Franks hearing, to explore the validity of a search warrant affidavit, a defendant must make a "substantial preliminary showing" that: (1) the affidavit contained a material false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause. 438 U.S. at 155-56. As we have noted, "[t]hese elements are hard to prove, and thus Franks hearings are rarely held." United States v. Swanson, 210 F.3d 788, 790 (7th Cir. 2000). A defendant seeking a Franks hearing "bears a substantial burden to demonstrate probable falsity." United States v. Hornick, 815 F.2d 1156, 1158 (7th Cir. 1987). Moreover, "an unimportant allegation, even if viewed as intentionally misleading, does not trigger the need for a Franks hearing." Swanson, 210 F.3d at 791. We agree with the district court that no hearing was necessary here.

Maro's primary claim in his suppression motion was that there was a fatal discrepancy between witness Michael Koehlar's trial testimony and what Special Agent Mullarkey's affidavit said of Koehlar's observations. The affidavit said that Koehlar saw "a white male running from the bank, through the bank parking lot to a maroon Taurus parked in the parking lot." Koehlar then "watched the man drive toward the building that he was working in . . . ." Furthermore, Maro says Koehlar's rendition of the license plate was off. At trial, Koehlar testified that he saw an individual wearing a white baseball hat running at a fast rate of speed across the parking lot in front of the bank, but that he could not tell whether the person was male or female. He testified that he did not see the man actually leave the bank. He also said he could not see the person get into a Taurus, but he did testify that while he watched the area where he lost sight

of the person, a red Ford Taurus appeared driven by a male with a mustache, wearing a white baseball hat.

Another example of allegedly false and misleading statements in the affidavit is found in the description of the surveillance which was conducted. Special Agent Mullarkey said in her affidavit that she surveilled Maro's home and saw a white male leaving the residence; he was in his late thirties, wearing a baseball cap and sunglasses. That description would be consistent with Maro's appearance. Special Agent Mullarkey also said she followed him for a couple of miles to confirm that he had a mustache and resembled the bank surveillance photograph. What she did not say, and what is critical, according to Maro, is that the car in which the person drove off was not a red or maroon Taurus and that Special Agent Mullarkey could not confirm at that time that the person she observed was Maro--that despite her having a recent photo of Maro obtained from his parole officer.

Further damning to the affidavit, according to Maro, is that despite the fact that Special Agent Mullarkey knew that Geneva police officers may have taken photos during the surveillance of the home, there were no photos of Maro. Finally, Maro contends that conflicting physical descriptions of the robber were omitted from the affidavit. These discrepancies involve weight and height estimates-- particularly a weight estimate from teller Nichols which estimated Maro's weight as significantly heavier than he is. Nichols testified at trial that her original estimate was off.

These alleged affidavit shortcomings do not come close to the kind of egregious errors necessary to conduct a Franks hearing. Koehlar's statements, while technically contradictory, do not reveal a disregard of the truth. That the car in which the suspect was driving from Maro's house was not the Taurus is not significant. The affidavit also included the fact that the Taurus was parked at Maro's house. Omission of the fact that he drove off on one occasion in another car is hardly fatal. That no pictures of him were taken at his home is also not significant. The problem for law enforce ment was establishing that he was at the

banks, not that he lived at his own home. As to the weight estimates, even if the omission of conflicting weight estimates could be considered a significant omission, Maro has not shown that it was an intentional omission.

As to his sentence, Maro's first argument--that it constituted a violation of Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)--cannot be sustained. Maro thinks that an enhancement for making a threat of death was tantamount to sentencing him as an armed bank robber. The government argues the finding that he made a threat of death was not related to whether he was armed. The enhancement, according to the government, was based on his saying he had a gun, not on his actually having one. In any case, under these circumstances there is no Apprendi violation; the 2-level increase in his base offense level of which he complains did not raise the penalty above the statutory maximum for his offense. See, e.g., United States v. Behrman, 235 F.3d 1049 (7th Cir. 2000).

His other contention is that the upward departures in both his criminal history category and his offense level were improper and do not reflect the structure of the guidelines, as required by United States v. Cruz-Guevara, 209 F.3d 644 (7th Cir. 2000). The departures here were significant. Maro fell into criminal history category III, but the judge said that he did not believe that criminal history category was adequate. He placed him in category VI. As to the offense level, Maro fell into level 26, which again the judge did not think adequately represented the seriousness of the crime, so he departed upward to level 31, giving Maro a range of 188 to 235 months. The judge also said (an observation we share) that he saw "zero expression of remorse" and was convinced that within a year or two after getting out of jail, he "will be robbing banks again." The sentence imposed was 210 months.

The way this issue is offered presents us with a sticky wicket. Maro says the enhancements were too great and that his sentence of 210 months is too long. The government, although defending the enhancements, mostly argues that the district court should have treated Maro

as a career offender under the guidelines and that if he were treated as one, his present sentence would be at the bottom of the applicable range. So essentially the government says Maro has nothing practical to complain about. The problem is that the government has not cross-appealed on the district judge's failure to treat Maro as a career offender. But should a cross-appeal be necessary? After all, the government is satisfied with the sentence Maro received. Given these unusual circumstances, we think it best not to require a formal cross-appeal in order for us to consider the issue of whether or not Maro was, in fact, a career offender. And so, we will review the issue of whether or not Maro is a career offender as if there was a formal cross-appeal presented to us on that issue. For the reasons we are about to make clear, we think this is a sensible approach to take in a situation where we determine that a correct sentence was imposed, perhaps for an incorrect reason.

With that said, we review the question of whether or not Maro was a career offender under the guidelines. Importantly, we note first that embarking on this review comes as no surprise to Maro, who argued the inapplicability of career offender status in his reply brief. Second, we note that in a situation like this, the standard of review--de novo, clear error, or abuse of discretion--is unimportant, for the outcome would be the same under any standard.

At sentencing, the government requested, and the United States Probation Office recommended, that Maro be treated as a career offender. He had, after all, committed eight bank robberies in 1989 and, after being released from prison, committed the two involved in this case. Robbing banks seemed to come naturally to him. The judge declined to sentence him as a career offender, however, finding that his federal conviction and his state conviction based on the 1989 robberies were related and thus did not qualify as separate convictions for purposes of the career offender guideline. The judge thought it was a close question and said he did not "claim to have the magically truthful answer to it." We will answer the question.

A person is a career offender if

(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

USSG sec.4B1.1. For prior convictions to count under subsection (3) at least two must be "counted separately under the provisions of sec.4A1.1(a), (b), or (c)." USSG sec.4B1.2(c)(2). Prior sentences "imposed in unrelated cases are to be counted separately." But prior sentences imposed in related cases are not. sec.4A1.2(a)(2). Application Note 3 to sec.4A1.2 says that "prior sentences are considered related if they resulted from offenses that (A) occurred on the same occasion, (B) were part of a single common scheme or plan, or (C) were consolidated for trial or sentencing."

Maro committed eight robberies in 1989, six in Illinois and two in Wisconsin. He was charged in both the Northern District of Illinois and the Western District of Wisconsin. The Wisconsin case was transferred to Illinois, pursuant to Rule 20 of the Federal Rules of Criminal Procedure. Maro entered guilty pleas to two counts from both indictments-- four counts in all. In his plea agreement he stipulated to the other robberies, and the others were listed in the presentence report. For sentencing in those cases, the offense levels for each robbery were calculated and the offense level determination included a 5-level increase, pursuant to USSG sec.3D1.4. A 5-level increase is the maximum allowed under that section and in this case resulted from grouping the four bank robberies to which Maro pled guilty and one other robbery, leaving three which had no effect on his sentence. Later, Maro was charged and convicted in one of the four stipulated robberies, the Will County robbery of the Lincoln Way Federal Savings and Loan Association in Frankfort, Illinois. His sentence in that case was ordered to run concurrent with his federal sentence.

The question for us is whether the district judge in the present case was wrong to find that the Will County proceeding was not a prior conviction for purposes of sec.4B1.1 because it fell under subsection (C) of the application note: that it and the federal case "were consolidated for trial or sentencing" and thus the Will County case could not be counted as a prior offense for purposes of the present sentencing. The easy answer, of course, is that the Will County robbery was a prior conviction because it was not consolidated with the robberies charged in federal court either for trial or for sentencing. But we are not literalists. We will decide whether the fact that the Will County robbery was acknowledged in the plea agreement and the presentence report in the federal case is enough to prevent it from being counted as a prior offense after Maro robbed the two Illinois banks in 1999.

The question comes down to how many free passes Maro is entitled to under the guidelines. Because of the Rule 20 transfer, he is tagged with only one prior conviction from the two indictments in two different districts in which he entered pleas to four of the 1989 robberies. Clearly a good deal. Does he also get a free pass for a state court conviction in Will County because it also was a bank robbery which he acknowledged pulling off? We have previously cautioned that because a person lives a "life of crime" does not mean that all his criminal actions come under the umbrella of a giant criminal plan. United States v. Brown, 962 F.2d 560 (7th Cir. 1992). We also know that the fact that a person goes on a crime spree does not make all his criminal acts related. United States v. Sexton, 2 F.3d 218 (7th Cir. 1993). We know that concurrent sentences do not necessarily make crimes related. Brown. Maro has two prior convictions: one in federal court, one in state court. Because he committed so many robberies in 1989 it was not necessary, at the time of the federal sentencing, to rely on the Will County robbery to support the 5-level increase under sec.3D1.4 for his combined offense level. The Will County case retains sufficient independence to be considered a separate conviction for purposes of the sentencing guidelines. Consequently, it was as clear as crystal that Maro had two prior countable convic

tions--and was thus a career criminal--
when he was convicted again in 1999.

   As a career criminal, his sentencing
range is 210 to 262 months. His sentence
of 210 months is, obviously, at the low
end of the range. As we have noted, the
government has informed us that it is
satisfied with the length of the sentence
imposed. So what we have is the right
sentence for the wrong reasons. We see no
reason to require a new sentencing
hearing. This judgment is AFFIRMED in
part, MODIFIED in part, and the case
REMANDED for the entry of a corrected
judgment of conviction reflecting Maro's
status as a career offender.