# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30811

United States Court of Appeals
Fifth Circuit

**FILED**
September 28, 2018

Lyle W. Cayce
Clerk

BRIAN PORTER; SHARON EDWARDS,

      Plaintiffs - Appellants

v.

JORDON LEAR, Detective; ORSCINI BEARD, Detective; PAUL BARBIN, Officer,

      Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:14-CV-473

Before KING, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:*

    In the summer of 2013, a series of armed robberies plagued Baton Rouge. Baton Rouge Police Detective Jordan Lear erroneously accused Brian Porter of conducting two of these robberies. Police officers descended on Porter's home, searched his apartment, and arrested him. Unsure of Porter's exact residence, the officers also searched Porter's mother's home next door. As a result of these accusations, Porter was detained for several months. During this detention,

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30811

Detective Orscini Beard and Officer Paul Barbin incorrectly accused Porter of committing additional robberies. Porter and his mother, Sharon Edwards, brought suit against Lear, Beard, and Barbin for violations of their Fourth, Fifth, and Fourteenth Amendment rights. The magistrate judge granted the officers' motion for summary judgment.[1]

We AFFIRM.

## I.

## A.

This case concerns a series of four robberies. The first robbery occurred on July 13, 2013, when an armed man robbed a Baton Rouge Family Dollar Store. Detective Lear, a detective with the Baton Rouge Police Department ("BRPD"), investigated the case. Lear interviewed several eyewitnesses at the scene, who reported that the robber pulled a shotgun with silver duct tape wrapped around the handle from his pants and demanded money from the cashiers. Three witnesses described the robber as a black male between 6'1" and 6'2", weighing around 160 pounds. One witness said that the robber "possibly" had a tattoo on his forehead or near his eye. Another said that he had a mark on his forehead, but she was unsure what the mark was. Neither witness could further describe the marking. The man wore a baseball hat and a black bandana over his mouth. Lear recovered the black bandana from the scene.

Continuing the investigation, Lear watched the store's surveillance video. Lear obtained a still image of the robber's face from the surveillance video to distribute to the news media. The still image shows the robber's

---

[1] The parties consented to the magistrate judge's jurisdiction, in accordance with 28 U.S.C. § 636(c).

2

uncovered face, after the bandana had fallen to the floor. The still image does not show a marking on the man's face or forehead.

The next day, July 14, 2013, two armed men robbed a Wendy's Restaurant on Florida Boulevard (the "Florida Boulevard Wendy's"). Lear also investigated the Florida Boulevard Wendy's robbery, again conducting several witness interviews. One witness described the first robber as a black male between 5'10" and 6'0", weighing approximately 160 pounds. This robber wore a hat on his head and a woman's scarf around his neck. The witness stated that he "possibly" had colorful tattoos on his face. The man carried a long black sawed-off shotgun with silver duct tape wrapped around the handle. The witnesses described the second robber as a black male, between 5'8" and 5'9", and 150 to 160 pounds. The men took two employees' cell phones and coerced the store's manager into emptying the cash registers and safe. The store's manager felt confident that she could identify the robbers if she saw them again. She did not mention in her statement to Lear whether she saw any tattoos on either robber.

On July 22, 2013, two men attempted to rob another Wendy's Restaurant on Plank Road (the "Plank Road Wendy's"). Beard investigated the robbery. Witnesses described the first robber as a black male in his early twenties, approximately 5'10", and weighing 180 to 190 pounds. This robber was wearing a black cloth that covered the lower portion of his face and was armed with a sawed-off shotgun. The witnesses did not provide a description of the second robber, except that he was a black male armed with a handgun.

On July 29, 2013, the Florida Boulevard Wendy's was robbed again, this time by three black men wearing ski masks. Barbin investigated this robbery. One witness stated that two of the suspects were around 5'10", weighing 160 to 170 pounds, with dark skin. Another witness described one of the robbers as being between 6'1" and 6'4", and weighing between 160 and 170 pounds. The

No. 17-30811

third robber was shorter, and witnesses did not provide a description of his weight. One suspect was armed with a small black revolver, and another had a black shotgun with grey duct tape around the fore grip. The store's manager, who had been present at the first Florida Boulevard Wendy's robbery, told Beard that she thought the suspects were the same suspects from the first robbery. She stated that the robbers seemed familiar with Wendy's policies for storing money in the safe and she was positive that the robbers had the same shotgun.

**B.**

Meanwhile, Lear continued his investigation of the Family Dollar and Florida Boulevard Wendy's robberies. On July 15, 2013, shortly after the Family Dollar robbery, a local news station aired the still image from the Family Dollar surveillance video on a "Crime Stoppers" segment. As a result of the segment, Lear received two tips identifying Brian Porter as the man who robbed the Family Dollar. Lear ran Porter's name through police- and state-run databases. He learned that the only Brian Porter in the area was 34 years old, between 6'3" and 6'4", and weighed between 156 to 185 pounds. He also obtained Porter's driver's license photograph. Lear compared the driver's license photograph to the still image from the surveillance tape and the witnesses' descriptions and confirmed the resemblance. Lear then sent the photograph to a crimes analyst, who created a six-person photo lineup with Porter's photograph in the second position.

On July 29, 2013, Lear conducted photo lineups with one witness from the Family Dollar robbery and three witnesses from the first Florida Boulevard Wendy's robbery. Three witnesses—including the Family Dollar witness who had told Lear that the robber possibly had a face tattoo—identified Porter as the robber, and signed statements to that effect. A fourth witness identified Porter as a possible suspect, but was "not 100%" sure. By affidavit, Lear swore

4

No. 17-30811

that he did not make comments or gestures "to force or persuade any witness into identifying" Porter.

The same day, Barbin conducted a photo lineup with the store manager from the Florida Boulevard Wendy's. She picked Porter and another individual in the lineup, but said she could not be sure.

After the lineups, Lear searched police and state databases for Porter's address. Based on his search, Lear found an address for Porter's house, which he confirmed against the address listed on Porter's current driver's license. Lear also learned from a confidential informant that Porter may reside at a nearby apartment. The house and apartment are "side by side."

## C.

The day after the lineups, on July 30, 2013, Lear prepared affidavits of probable cause to support five warrants: a warrant to search the house; a warrant to search the apartment; two arrest warrants for Porter—one for the Family Dollar robbery and another for the first robbery of the Florida Boulevard Wendy's; and another warrant for seizure of Porter's DNA, to be compared against the bandana found at the Family Dollar. Beard and Barbin did not participate in preparing these affidavits. A state-court judge issued all five warrants on July 30.

The affidavits of probable cause to search the properties related the basics facts of the Family Dollar robbery, the Crime Stoppers tips identifying Porter as the perpetrator, and that one victim had positively identified Porter in a photo lineup. The affidavit for the apartment additionally stated that a confidential informant who had "provided very reliable and confirmed information in the past" told Lear that Porter frequented the apartment, the informant had seen Porter at the address daily, and the apartment was next door to the house Lear had already identified as a possible residence. The DNA seizure affidavit and arrest affidavits included similar information.

5

No. 17-30811

The affidavits did not state the disparities between the witnesses' descriptions of the robber and Porter's actual height, weight, and age. Witnesses estimated that the robber was anywhere from 5'10" to 6'3", but Porter's height is between 6'3" and 6'4". The descriptions of the robber's weight and Porter's actual weight were closer—witnesses estimated that the robber weighed between 150 to 180 pounds, and Porter's weight was listed as being 156 to 185 pounds. Additionally, Porter does not have a face tattoo, which three witnesses indicated was a possibility.

The search warrants authorized Lear to search both properties "at any time of the day or night" for clothes worn during the robbery, items taken during the robberies, and other evidence of the robberies.

### D.

In the early morning of July 31, 2013, the BRPD Special Response Team ("SRT") executed the warrants. Beard and Barbin were not present for either search. Lear was present, but did not enter either residence until it was "secured" and Brian Porter had been detained. The SRT forcibly entered both houses by breaking off the doors and setting off flash bang grenades. The SRT team found Porter at the apartment and took him into custody. The officers searched the premises for any evidence of the robberies, including money, but found nothing. The officers did, however, recover a cell phone and handgun from the apartment, both of which had been reported stolen.

After being read his *Miranda* rights, Porter denied participating in the robberies. Nonetheless, Lear filed affidavits of probable cause against Porter later that day for illegal possession of the stolen cell phone and illegal possession of a stolen firearm. Barbin and Beard filed affidavits of probable cause for the July 22 and July 29 Wendy's robberies the same day.

Meanwhile, Lear continued his investigation. On July 31, the same day as the search and arrest, Lear conducted a photo lineup with another witness

No. 17-30811

from the Family Dollar. The witness identified Porter almost immediately. Additionally, Lear listened in on jail calls between Porter and Edwards. On one call, Lear heard Edwards insinuate that she had spoken to Porter's boss and that he would say whatever was necessary to provide Porter with an alibi. Thus, Lear did not further investigate Porter's alibi.

On August 27, 2013, the DNA test results came back from the bandana. The bandana did not have a DNA profile consistent with Porter's DNA. Lear contacted the assistant district attorney handling the case the same day to inform him of this development.

Despite the lack of DNA identification, Porter was charged in a three-count bill of information on September 17, 2013. Two counts related to the Family Dollar and first Florida Boulevard Wendy's robbery. The third pertained to Porter's possession of a stolen handgun.

Over the course of Porter's imprisonment, the armed robberies continued. Eventually, the actual robbers were apprehended and Thomas Davis confessed to the Family Dollar robbery. Lear then informed the assistant district attorney. The State dropped the robbery charges against Porter on October 2, 2013, and he left jail on bond shortly thereafter. The State dismissed the charge for illegal possession of the stolen firearm on April 8, 2014.

**E.**

Porter and Edwards brought suit against Lear, Beard, and Barbin in their individual capacities under 42 U.S.C. § 1983, claiming the officers violated their rights under the Fourth, Fifth, and Fourteenth Amendments. Specifically, they allege that the officers conducted illegal and excessive searches of their houses. Plaintiffs also contend that the officers falsely arrested Porter, illegally detained him, and maliciously prosecuted him. Plaintiffs assert various due-process violations, such as the use of a defective warrant and police report to taint or poison a jury pool, defamation, the use of

7

defective lineup procedures, and failure to include exculpatory evidence. Plaintiffs also assert various state-law claims.

The officers moved for summary judgment, arguing that they were entitled to qualified immunity. Plaintiffs opposed the motion, and moved to strike various parts of the officers' summary judgment exhibits as inadmissible hearsay. The officers likewise moved to strike the plaintiffs' expert report. The district court granted the officers' motion for summary judgment, dismissed plaintiffs' § 1983 claims with prejudice, and dismissed their state-law claims without prejudice, declining to exercise supplemental jurisdiction over them. The district court also granted defendants' motion to strike but denied plaintiffs' motion to strike.

## II.

"We review a district court's grant of summary judgment de novo, applying the same standard on appeal as that applied below." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the court views the evidence in the light most favorable to the non-moving party, that party must still "come forward with specific facts indicating a genuine issue for trial." *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

Summary judgment is properly granted in favor of the defendant when the undisputed facts and inferences drawn in the plaintiff's favor show the defendant is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S.

223, 227 (2009). "Once the defendant raises the qualified immunity defense, 'the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.'" *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)).

We conduct a two-step analysis to determine whether a defendant is entitled to qualified immunity. First, we consider whether the plaintiff has shown "that the official violated a statutory or constitutional right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Second, we determine whether the plaintiff has shown that the right was "'clearly established' at the time of the challenged conduct." *Id.* (quoting *Harlow*, 457 U.S. at 818). A court may address these prongs in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A plaintiff's failure to meet his or her burden on either prong will free the court from any obligation to address the other. *See Pearson*, 555 U.S. at 241-42.

### III.

Plaintiffs' challenges to the entry of summary judgment are without merit because plaintiffs fail to demonstrate grounds to overcome the officers' qualified immunity. Plaintiffs claim that the officers falsified affidavits of probable cause, causing illegal searches and Porter's false arrest; performed needlessly destructive searches; and illegally detained Porter after discovering exonerating evidence. Plaintiffs also make various due-process claims and challenge the district court's evidentiary rulings. We address each argument in turn.

### A.

Plaintiffs first argue that the officers falsified affidavits of probable cause, leading to illegal searches of their homes and Porter's false arrest, in violation of their Fourth Amendment rights. First, plaintiffs have not shown

the violation of a statutory or constitutional right. Typically, an officer is insulated from a claim that a warrant lacked probable cause where an independent intermediary (here, the state-court judge) reviews the facts of the case and allows it to go forward, thereby "break[ing] the chain of causation for false arrest." *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (quoting *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994)). An officer may lose this protection when he taints the actions of the intermediary—that is to say, if "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable," the officer will not be protected from suit. *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). Thus, a Fourth Amendment violation occurs when "an officer intentionally, or with reckless disregard for the truth, includes a false statement in a warrant application." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). "Likewise, the intentional or reckless omission of material facts from a warrant application" also violates the Fourth Amendment. *Id.* (citing *Hale v. Fish*, 899 F.2d 390, 400 n.3 (5th Cir. 1990)). Such an omission must be "clearly critical" to a finding of probable cause. *Hale*, 899 F.2d at 400 (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)).

With these principles in mind, we conclude that Lear's affidavits did not taint the state-court judge's probable-cause findings such that he could not rely on the warrants. The affidavits are not "so lacking in indicia of probable cause as to render" Lear's belief in its existence unreasonable. *See Malley*, 475 U.S. at 344-45. The Family Dollar and Wendy's affidavits recounted the facts of each robbery and noted the tips and positive photo identifications. Nor did Lear omit material information. The plaintiffs identify three omissions: (1) that Lear "prompted" a witness to select Porter from the photo lineup; (2) that the witnesses could not see the Family Dollar robber's full face due to the black

bandana; and (3) certain "exculpatory evidence." These omissions were not material.

First, plaintiffs have not presented any evidence to support their claim that Lear prompted a witness to select Porter from the photo lineup. Their only basis for this allegation is Porter's uncorroborated hearsay. In his deposition, Porter stated that he had gone to the Family Dollar himself and an unnamed clerk told him that Lear had influenced her photo identification. Hearsay cannot create a genuine issue of material fact. *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."); *see also* Fed. R. Evid. 801(c) (defining "hearsay" as an out-of-court statement made to prove the truth of the matter asserted).

Second, that the Family Dollar robber's face was hidden was not "clearly critical" to the finding of probable cause. As evidenced by the still photo taken from the Family Dollar surveillance video, the black bandana fell away from the robber's face during the robbery. And even so, the bandana had only partially covered the robber's face. Moreover, there was no evidence that the July 14 Wendy's robber covered his face—at most, the police report stated that one of the robbers wore a women's scarf around his neck. Thus, it was not material that the Family Dollar robber's face had been partially obscured.

Finally, plaintiffs have not demonstrated that the exculpatory information omitted from the affidavit would be "clearly critical" to the finding of probable cause. Plaintiffs argue that the affidavit omitted variations in height, skin tone, and age between the witnesses' descriptions and Porter's actual height, skin tone, and age. But it was not unreasonable to omit these slight variations in light of the multiple positive eyewitness identifications. *See United States v. Maro*, 272 F.3d 817, 822 (7th Cir. 2001) (holding that omission of significant weight disparity did "not come close to the kind of egregious

errors necessary to conduct a *Franks* hearing," let alone establish constitutional violation); *Wilson v. Russo*, 212 F.3d 781, 791-92 (3d Cir. 2000) (holding that omission of four-to-seven inch height disparity and witness's failure to identify plaintiff in photo lineup were not material when a credible eyewitness positively identified plaintiff).

Plaintiffs' argument that Lear should have disclosed the robber's facial tattoo is similarly without merit. Only some eyewitnesses stated that the robber had a tattoo, and some were unsure whether it was a facial tattoo or other marking. There was no visible face tattoo in the photograph from the Family Dollar. Thus, we cannot say that Lear acted intentionally or recklessly by omitting the fact of the facial tattoo from the affidavit of probable cause.

For these reasons, we find that the omissions in Lear's affidavits were not sufficient to constitute a violation of Porter's and Edwards's Fourth Amendment rights.

Any argument that Lear lost probable cause upon seeing Porter's tattoo-free face, thus turning Porter's custody into a false arrest, is likewise without merit. "Claims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest." *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001). "[I]f there was probable cause for any of the charges made . . . then the *arrest* was supported by probable cause, and the claim for false arrest fails." *Id.* (omission in original) (quoting *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995)). Thus, even if it had been obvious to Lear that Porter did not commit the robberies when he saw him after the search, Lear still had probable cause to arrest Porter for illegal possession of stolen things under La. Stat. Ann. § 14:69(B) based on the handgun and cell phone found in Porter's house. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has

committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Plaintiffs' argument against Beard and Barbin's qualified immunity is even weaker. It was Lear's affidavits—not Beard's or Barbin's—that supported the relevant search and arrest warrants. There is no evidence that Beard or Barbin participated in drafting Lear's affidavits, or in the breach, search, or arrest. The affidavits they executed for the later robberies were issued after the search and arrest had occurred. And no formal charges were brought against Porter for Beard and Barbin's affidavits. Thus, plaintiffs have not demonstrated that Beard or Barbin violated their statutory or constitutional rights, and the officers are entitled to qualified immunity.

For these reasons, we conclude that plaintiffs fail to satisfy their burden of demonstrating that the officers were not entitled to qualified immunity and affirm summary judgment on the false-affidavit charges.

**B.**

Porter and Edwards argue that the destructive search of their homes violated their Fourth Amendment rights. On this issue, plaintiffs fail on the first prong of the qualified-immunity analysis, as they have not established that the officers committed a statutory or constitutional violation in relation to the destructive search. As discussed, Beard and Barbin were not present for the breach or search. Lear testified that he did not participate in the breach and did not perform the destructive parts of the search. And plaintiffs did not name any members of the SRT unit as defendants. Because the officers did not participate in the destructive search, they cannot be liable for any resulting constitutional violations. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (noting that as "prerequisite" to qualified immunity claim, plaintiff "must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the

constitutional violation alleged" (quoting *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995))).

Plaintiffs do not dispute that the officers did not participate in the search. Instead, in their reply brief on appeal, plaintiffs argue that Lear is liable on a theory of bystander liability. Because this argument was only raised on reply, it is forfeited. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994). Moreover, although this court has recognized bystander liability claims under § 1983 in the context of excessive-force claims, *see Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), plaintiffs cite no caselaw applying bystander liability to an excessively-destructive-search claim. Thus, plaintiffs have not met their burden of showing a clearly established constitutional violation and cannot overcome the officers' qualified immunity.

**C.**

Porter also argues that the officers continued to illegally detain Porter, even after they realized he did not commit the robberies. To establish police liability for illegal detention, the plaintiff must show that "the conduct of the defendants amounts to more than negligence." *Simmons v. McElveen*, 846 F.2d 337, 339 (5th Cir. 1988). The plaintiff must show that the officer either deliberately ignored exonerating evidence or conducted a reckless investigation. *See Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992).

Porter fails to demonstrate that Lear's conduct rises above mere negligence. When Lear learned that the DNA results from the bandana did not match Porter's DNA, he notified the assistant district attorney. When he learned that Thomas Davis had confessed to the robberies, Lear notified the assistant district attorney again. Although Lear did not give credence to certain evidence, such as the face tattoo, the height difference, Porter's alibi, and the continued robberies, none of the evidence was exonerating or reflective of a reckless investigation. As described above, the height differences were

14

minimal, and no witness was certain that Porter had a face tattoo. And one of the witnesses who had identified the robber as possibly having a face tattoo nevertheless identified Porter in a photo lineup. As for the continued robberies, Lear could have reasonably assumed that Porter had accomplices who continued to conduct robberies after Porter was detained. And he found his alibi not to be credible after hearing Porter's and Edwards's conversation intimating that Porter's boss was willing to feign an alibi. In contrast, Lear had four positive eyewitness identifications and various tips identifying Porter as the robber. For these reasons, it cannot be said that Lear deliberately ignored exonerating evidence or conducted a reckless investigation, and, therefore, Porter has not proven that Lear is not entitled to qualified immunity.

As with plaintiffs' falsified-affidavit and destructive-search claims, Porter fails to identify Beard and Barbin's participation in Porter's detention. Accordingly, we cannot say that they have committed a statutory or constitutional violation, and Beard and Barbin are entitled to qualified immunity as well.

For these reasons, we affirm the district court's grant of summary judgment on Porter's illegal-detention claim.

## D.

Plaintiffs' various other claims are unsupported by law. Porter first argues that a federal cause of action exists under § 1983 for a malicious prosecution. But "no such freestanding constitutional right to be free from malicious prosecution exists." *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003) (en banc).

Porter also claims certain due-process violations arising out of his false arrest and illegal detention, as well as the officers' suggestive identification techniques, suppression of exculpatory evidence, and press release. But even

assuming a cause of action for these claims exists under the Fifth and Fourteenth Amendments, Porter has not identified how these deprivations occurred without due process of law. *See Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 814 (5th Cir. 2010) ("[T]here [is] no Fourteenth Amendment 'liberty interest' or substantive due process right to be free from criminal prosecution unsupported by probable cause." (citing *Albright v. Oliver*, 510 U.S. 266, 270-71 (1994))).

Finally, although plaintiffs mention their state-law claims in passing, they have not argued that the district court abused its discretion in declining to exercise supplemental jurisdiction over these claims. Therefore, any such argument is forfeited. *See United States v. Scroggins*, 599 F.3d 433, 446-47 (5th Cir. 2010); *see also* Fed. R. App. P. 28(a)(8)(A) (requiring appellants to assert their "contentions and the reasons for them" in briefing on appeal); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").

**E.**

Porter and Edwards argue that the district court erroneously admitted hearsay evidence by allowing the officers' depositions, affidavits, and reports, as well as witnesses' unsworn lineup statements, to be considered on the summary judgment motion. They additionally dispute the district court's exclusion of two opinions from their expert witness, Lloyd Grafton: (1) that Lear deliberately relied on information that was insufficient for a finding of probable cause; and (2) that Lear's probable cause finding was improper. We review evidentiary rulings for an abuse of discretion. *See Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 667 (5th Cir. 1999).

We find no abuse of discretion. The challenged statements were not offered to prove the truth of what they said—that is, that Porter was actually

No. 17-30811

involved in the armed robberies. Instead, they are offered to show what the officers knew during the investigation and their reasoning in making their probable cause determinations. These are non-hearsay purposes. Fed. R. Evid. 801(c); *United States v. Dunigan*, 555 F.3d 501, 507 (5th Cir. 2009) ("Testimony describing an investigation's background should not be needlessly objected to on hearsay grounds where it goes only to how police investigated a crime rather than to the truth of the matter asserted.").

Nor do we find an abuse of discretion in the district court's exclusion of Grafton's opinions. Under Federal Rule of Evidence 702, expert opinion testimony is admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Grafton's opinions went to pure questions of law. *See United States v. Muniz-Melchor*, 894 F.2d 1430, 1439 n.9 (5th Cir. 1990) (noting that whether an officer has probable cause is a mixed question of law and fact, but the ultimate determination is a question of law). Although Federal Rule of Evidence 704 permits opinions that "embrace[] an ultimate issue," this court has "repeatedly held that [Rule 704] does not allow an expert to render conclusions of law." *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 198 (5th Cir. 1996).

Therefore, we affirm the district court's evidentiary rulings.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.