In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2686

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHONTAY DESSART,

*Defendant-Appellant,*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 12-CR-85 — **William C. Griesbach**, *Chief Judge.*

ARGUED JUNE 2, 2015 — DECIDED MAY 17, 2016

Before POSNER, EASTERBROOK, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* From his home in tiny Reedsville, Wisconsin, Shontay Dessart manufactured and sold products containing the active chemical ingredients in numerous prescription drugs, offering them for sale online with the disclaimer "for research only" to evade the oversight of the U.S. Food and Drug Administration. He was convicted of violating the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331,

with the intent to defraud or mislead the agency, which converted his violations from strict-liability misdemeanors into specific-intent felonies, *id.* § 333(a)(2). On appeal Dessart contends that (1) the FDA's investigator lied in procuring a search warrant and the warrant otherwise lacked probable cause; (2) the government's evidence was insufficient to prove that he acted with deceptive intent; and (3) the district court erred in instructing the jury on the definition of "prescription drug." Long story short: Dessart lied, the investigator didn't, the warrant was backed by ample probable-cause, and there was no instructional error. We affirm.

## I. Background

### A. The Investigation

In September 2008 U.S. Customs and Border Protection officers in Chicago seized a package addressed to Shontay Dessart in rural Reedsville, Wisconsin. The package contained 100 injectable vials of white powder, which the officers suspected was human growth hormone ("HGH"). Customs agents contacted the FDA, and Special Agent Loris Cagnoni was assigned to lead the investigation.

Once on board Agent Cagnoni learned that a local narcotics task force in Wisconsin had received an anonymous tip in July that Dessart was operating an illegal online "pharmacy" from his home in Reedsville, selling prescription drugs on the website www.EDS-Research.com and also selling steroids in bars around Appleton, Wisconsin. Agent Cagnoni visited the website, which listed numerous bodybuilding and performance-enhancing drugs for sale, including one called "HGH Frag," as well as the chemicals sildenafil, tadalafil, and vardenafil, the active ingredients in the

prescription drugs Viagra, Cialis, and Levitra. The products advertised on the website carried a disclaimer saying the drugs were "for research only."

On October 23 Customs officers intercepted a second package addressed to Dessart at the same address. This one contained 250 vials of white powder nearly identical to those in the first. Five days later a U.S. Postal Service inspector contacted Agent Cagnoni to inform him that someone by the name of Erica Lynn Gabrielsen had inquired about the delivery status of the second package via the Postal Service's package-tracking website. That same day Customs seized a third package nearly identical to the other two. This one was addressed to Gabrielsen at an apartment in Appleton.

With the third package in their custody, the agents decided to move on what they suspected was an HGH-trafficking operation. Agent Cagnoni submitted an affidavit to a magistrate judge describing the packages and their contents, the anonymous tip, and the information he had gleaned from browsing the EDS-Research website. Agent Cagnoni averred that there wasn't time to test the intercepted substances because chemical testing would "take approximately six weeks" and thus compromise the controlled delivery the agents were planning to undertake with one of the packages. The magistrate judge found probable cause and issued a search warrant for Dessart's Reedsville residence.

On October 29, after making a controlled delivery of one of the packages, state and federal agents executed the warrant. Both Dessart and Gabrielsen were home. (Gabrielsen was Dessart's girlfriend and is now his wife.) Inside the residence the agents discovered extensive evidence of a

pharmaceutical manufacturing operation: raw chemicals in powder and liquid form, materials for making chewable tablets, flavorings, colorings, glass vials and bottles, packaging materials and labels, a digital scale and measuring instruments, and various other pieces of equipment associated with the manufacture, packaging, and distribution of pharmaceutical drugs. They also found a black duffle bag containing roughly 20 ready-to-ship U.S. Postal Service packages, each of which held one or more blue bottles of tablets or liquids. Labels affixed to the bottles listed "EDS Research Supplies Inc." as their originator, along with the disclaimer "for research only." Dessart gave the agents access to his business records—including databases listing his customers, products, and orders—and told them that computers in Gabrielsen's Appleton apartment also were used to operate the business.

While the search was ongoing, Agent Cagnoni spoke with Gabrielsen in a separate room and obtained her consent to search the Appleton apartment. The details of this conversation are disputed, specifically (1) whether Gabrielsen, who was eight months pregnant at the time, was handcuffed when she signed a consent-to-search form; (2) whether Agent Cagnoni kicked her; and (3) whether she was induced to sign by a promise that she could use her phone to arrange child care for her stepson. It's undisputed, however, that Gabrielsen signed a written consent to search her Appleton apartment, to which the third intercepted package had been addressed. There the agents seized two computers and additional evidence of the prescription-drug-trafficking operation.

The agents sent samples of the substances recovered from the Reedsville residence and the intercepted packages to the crime laboratory for chemical testing. The results came back three weeks later; the powder was not HGH after all. Rather, the raw chemicals and finished products contained the active ingredients for a variety of prescription drugs, including Viagra, Cialis, Levitra, and Propecia.

**B. Indictment and Trial**

Dessart was indicted on 23 counts of violating the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331. Count 1 charged him with operating an unregistered pharmaceutical manufacturing business. *Id.* § 331(p). Counts 2 through 12 alleged that he sold misbranded drugs in interstate commerce. *Id.* § 331(a). Counts 13 through 23 alleged that he misbranded drugs held for sale after shipment in interstate commerce. *Id.* § 331(k). Violations of § 331 ordinarily are strict-liability misdemeanors, but the government alleged that Dessart committed the violations with intent to defraud or mislead the FDA, which subjected him to felony penalties. *See id.* § 333(a)(2).

Dessart moved to suppress the evidence seized from his Reedsville residence and the Appleton apartment. He argued that the warrant affidavit did not establish probable cause and Gabrielsen's consent was involuntary. He also requested a *Franks* hearing, *see Franks v. Delaware*, 438 U.S. 154 (1978), to challenge what he claimed was a material intentional falsehood in the warrant affidavit. Specifically, he accused Agent Cagnoni of falsely stating that chemical testing would take "approximately six weeks."

A magistrate judge concluded that the warrant was supported by probable cause and any mischaracterization of the testing time was inadvertent and immaterial. The district judge agreed and declined to suppress the evidence seized in the Reedsville search. But the judge granted the motion in part, excluding the evidence recovered from the Appleton apartment because the government hadn't established that Gabrielsen's consent was voluntary. Later, in light of our decision in *United States v. Pelletier*, 700 F.3d 1109 (7th Cir. 2012), the judge revisited and reversed this ruling, concluding that the inevitable-discovery doctrine applied. Finally, the judge denied Dessart's request for a *Franks* hearing.

Dessart then pleaded guilty to two misdemeanor violations of the Act, avoiding the felony designation and enhanced penalties under § 333(a)(2). Before sentencing, however, he fired his lawyer, asked to proceed pro se, and moved to withdraw his guilty plea. The judge obliged.

That move proved inadvisable. The judge declined to reconsider the *Franks* ruling and rejected Dessart's second suppression motion, which was largely repetitive of the first. The case proceeded to trial, and a jury convicted Dessart on all counts.

## II. Discussion

We can group Dessart's appellate arguments into three baskets: (1) challenges to the search warrant (both the probable-cause determination and the denial of his request for a *Franks* hearing); (2) arguments about the sufficiency of the government's evidence; and (3) a challenge to the jury instruction defining the term "prescription drug."

## A. The Search Warrant

### 1. *Probable Cause*

Dessart's first argument is that the district judge should have granted his suppression motion because Agent Cagnoni's warrant affidavit didn't establish probable cause to search his home. The proper focus of an appellate claim of this sort "is whether the judge who *issued* the warrant (rarely the same as the judge who ruled on the motion to suppress) acted on the basis of probable cause. On *that* issue we must afford 'great deference' to the issuing judge's conclusion." *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008) (internal quotation marks omitted) (first emphasis added).

The issuing magistrate judge's decision easily survives this deferential review. Three aspects of Agent Cagnoni's affidavit are particularly salient. First, the affidavit provided a detailed description of the hundreds of vials of white powder that were found in the packages intercepted by Customs and explained why this evidence pointed to an illicit HGH-trafficking business operating from Dessart's Reedsville residence. Agent Cagnoni also described his prior experience purchasing HGH in an undercover capacity and his involvement in other investigations in which similar packages originating from China were seized and later determined to contain illicit HGH. He explained that the white powder contained in the intercepted packages was identical in size, weight, color, and packaging as the HGH purchased or seized in these earlier investigations.

An experienced police officer's direct personal observation of suspected contraband provides probable cause for a search warrant "[a]bsent some reason to doubt the veracity

of the [officer's] affidavit." *United States v. Burge*, 683 F.3d 829, 832 (7th Cir. 2012). In *Burge* the contraband was marijuana plants. We accept for present purposes that identifying HGH is a more complex undertaking, but Dessart has given us no reason to doubt Agent Cagnoni's experience or veracity. It makes no difference that the agent was in fact mistaken about the contents of the vials (they contained other prescription drugs, not HGH). What matters is that his suspicions were grounded in his personal observation of the suspected contraband and his professional training and experience.

Second, the anonymous tip corroborated Agent Cagnoni's suspicions. When the police rely on a tip as support for a warrant application, the issuing magistrate engages in a "totality-of-the-circumstances analysis," taking account of the informant's "[r]eliability, veracity, and basis of knowledge." *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014). Granted, this analysis is more difficult when the tipster is anonymous. Dessart argues as well that the gap in time—nearly three months between the tip and the warrant application—made the tip stale. But considered in context and through the lens of our deferential standard of review, the anonymous tip reliably corroborated the other evidence gathered in the investigation. The tipster reported that Dessart was operating an online "pharmacy" from his Reedsville home and peddling steroids in Appleton bars. The tip contained important details that bolstered its credibility. For example, the tipster provided specific information about Dessart's website and knew that Dessart had a girlfriend who lived in Appleton. The tip, though anonymous, strengthened the probable-cause determination.

Third, and relatedly, the anonymous tip led Agent Cagnoni to log on to Dessart's website, EDS-Research.com. There he found substantial evidence that Dessart was engaged in the illegal distribution of HGH and prescription drugs. Among other bodybuilding and performance-enhancing products offered for sale, the website listed something called "HGH Frag" and chemicals containing the active ingredients in Viagra and Cialis—all carrying the disclaimer "for research only."

In short, Agent Cagnoni's affidavit gave the magistrate judge a robust factual foundation to authorize a search of Dessart's Reedsville residence. The district judge was right to reject the suppression motion.[1]

**2. Franks *Hearing***

Dessart also challenges the district judge's denial of his request for a *Franks* hearing. "[D]etermining the likelihood that [an investigator] lied in his warrant affidavit … involve[s] essentially the same process as fact-finding," so our review of this issue, too, is deferential, for clear error only. *United States v. Pace*, 898 F.2d 1218, 1227 (7th Cir. 1990).

To win a *Franks* hearing, the defendant must make a substantial preliminary showing that the officer who swore out the warrant affidavit "made a false statement knowingly and intentionally, or with reckless disregard for the truth." *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009) (internal quotation marks omitted). This preliminary show-

---

[1] Dessart also argues that the judge should have suppressed the evidence seized in the search of the Appleton apartment, but only as the fruit of an unlawful search of the Reedsville residence. Because the Reedsville search was not unlawful, this argument necessarily fails.

ing encompasses three elements: "(1) the affidavit contained a material false statement; (2) the affiant made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause." *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001). *Franks* hearings are "rarely held" because "[t]hese elements are hard to prove." *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000). Dessart has not come close to carrying his burden.

Dessart focuses on Agent Cagnoni's statement that chemical testing of the suspected HGH in the intercepted packages would take "approximately six weeks." Because the test results actually came back in three weeks, not six, Dessart argues that the agent's estimate was either an intentional falsehood or, at a minimum, a reckless misrepresentation made "to quickly … obtain a search warrant."

There are several flaws in this argument, not least of which is a fairly obvious materiality problem. The length of time required for chemical testing was informative but not necessary to the probable-cause determination; a laboratory's speed in returning test results has no bearing on the likelihood that a seized substance is illegal contraband. The district judge found the six-week estimate immaterial to the probable-cause calculus, and we agree. That alone is enough to sink Dessart's *Franks* argument.

For completeness, however, we'll briefly touch on Dessart's contention that the agent's six-week estimate was either intentionally false or reckless. As best we can tell, Dessart appears to be arguing that Agent Cagnoni didn't want the substances tested *at all*, either because he didn't actually believe the powder was HGH or because he didn't

care whether it was HGH but just wanted to obtain access to Dessart's residence. As evidence of this supposed nefarious intent, Dessart points to the fact that the agent didn't submit the first intercepted package for testing immediately after it was seized in September, but instead waited until after the second and third packages were intercepted and the search warrant was issued.

The failure to request immediate testing after the interception of the first package isn't particularly probative of Agent Cagnoni's intent in applying for the search warrant the following month. The record reflects that Cagnoni was actively pursuing other aspects of the investigation after the seizure of the first package in September, and the interception of two nearly identical packages in October no doubt strengthened the agent's suspicions. That he didn't send samples to the lab right away doesn't show that he intentionally falsified his estimate of the testing time.

That brings us to our final point: An essential element of a preliminary *Franks* showing is a *false statement*. The problem for Dessart is that Agent Cagnoni's approximation of the testing time wasn't false. We know that when the samples were tested in January 2009, the lab returned the results in three weeks rather than six. But an FDA chemist testified at trial that "the typical turnaround time for obtaining test results is 30 to 60 days." Agent Cagnoni's six-week estimate was well within the "typical" four-to-seven-week window.[2]

---

[2] In his reply brief, Dessart identifies a few other statements that he claims were reckless and misleading. This argument comes far too late and is waived. *See Darif v. Holder*, 739 F.3d 329, 336–37 (7th Cir. 2014) ("[A]rguments raised for the first time in a reply brief are waived.").

**B.  Sufficiency of the Evidence of Specific Intent**

Dessart next challenges the sufficiency of the evidence underlying his convictions. He argues that the government failed to present sufficient evidence that he acted with deceptive intent, a necessary factual predicate for felony penalties. As we've noted, violations of § 331 are ordinarily strict-liability misdemeanors, but if the defendant "commits such a violation with the intent to defraud or mislead," the offense converts to a felony and harsher penalties apply. § 333(a)(2).

The statute is silent as to the object of the deception, but the consensus among the circuits is that § 333(a)(2) applies if the defendant intended to deceive either consumers or the FDA or both. *See United States v. Andersen*, 45 F.3d 217, 219 (7th Cir. 1995) (rejecting in the context of Food, Drug, and Cosmetic Act violations committed with the intent to defraud the FDA the defendant's argument "that fraud on a regulatory agency does not support the use of § 2F1.1," the sentencing enhancement for "offense[s] involv[ing] fraud"); *United States v. Ellis*, 326 F.3d 550, 554 (4th Cir. 2003) ("The inquiry, therefore, is whether the defendant designed his conduct to avoid the regulatory scrutiny of the FDA."); *United States v. Bradshaw*, 840 F.2d 871, 874 (11th Cir. 1988) ("[T]he structure of the statutory scheme, the purpose of the statute, and the case law persuade us that Congress meant to encompass conduct intended to defraud government enforcement agencies.").

Any challenge to the sufficiency of the evidence comes with "a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). To prevail, Dessart "must convince us that even after viewing

the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Id*. (quotation marks omitted).

To recap the charges, in Count 1 Dessart was accused of operating an unregistered drug-manufacturing business in violation of § 331(p).[3] In Counts 2 through 12, he was accused of introducing misbranded drugs into interstate commerce in violation of § 331(a). In Counts 13 through 23, he was accused of misbranding drugs held for sale after shipment in interstate commerce in violation of § 331(k). Each count carried the § 333(a)(2) "with intent to defraud or mislead" enhancer.

The evidence of Dessart's intent to mislead the FDA was ample and easily sufficient to support the jury's verdict. The government adduced substantial evidence that Dessart was fully aware of the requirements of the Act and took affirmative steps to evade compliance. As we've explained, the government introduced extensive evidence establishing that Dessart was operating an online "pharmacy" out of his home by manufacturing and selling various prescription drugs to weight lifters, bodybuilders, and others seeking to enhance their physical appearance or performance. The government presented evidence of the items seized in Dessart's home—e.g., raw drug ingredients from overseas, flavorings, colorings, manufacturing equipment, packaging materials and labels, ready-to-use postal shipping packages—and also testimony from Dessart's customers. The drugs were, in fact, human prescription drugs and were specifically marketed and intended for that use, but Dessart affixed

---

[3] The registration duty is found in 21 U.S.C. § 360.

the label "for research only," both on his website and on the drug packaging itself. And EDS-Research.com carried a lengthy and detailed disclaimer explicitly discussing the Act and its prohibitions on introducing unapproved new drugs into interstate commerce. Among other things, the disclaimer stated that the products offered for sale were not to be used as "drugs … for humans or animals or for commercial purposes" and should not "be considered to be food, drugs, medical devices, or cosmetics."

This factual foundation is easily sufficient to support a reasonable inference that Dessart was aware of his obligations under the Act and was intentionally trying to evade the regulatory authority of the FDA. Indeed, it would have been surprising had the jury *not* drawn that inference. There is no other explanation for affixing a "for research only" disclaimer on drugs sold for human consumption.

## C. Jury Instructions

Finally, Dessart challenges the jury instruction defining the term "prescription drug." We review claims of instructional error for abuse of discretion, "approving on appeal instructions that 'fairly and accurately' summarize the law and have support in the record." *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003). Material errors of law automatically qualify as an abuse of discretion, so we review de novo the extent to which "the instruction completely and correctly states the law." *Savino v. C.P. Hall Co.*, 199 F.3d 925, 934 (7th Cir. 1999).

It would be hard to conclude that the challenged instruction misstated the law given that the judge lifted the definition of "prescription drug" essentially verbatim from the

statutory text. The Food, Drug, and Cosmetic Act defines a prescription drug as:

> (1) A drug intended for use by man which—
>
>> (A) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or
>>
>> (B) is limited by an approved application under section 355 of this title to use under the professional supervision of a practitioner licensed by law to administer such drug … .

21 U.S.C. § 353(b)(1).

Over Dessart's objection the judge limited the jury instruction to the definition in subsection (A), which covers drugs that possess certain characteristics—e.g., toxicity or potential for harmful effects—that make them safe to use only under the supervision of a licensed practitioner. Under subsection (B) a drug is a "prescription drug" if approved as such by the FDA. Because Dessart's products were not approved by the FDA, the judge omitted that part of the statutory definition.

Dessart raises two complaints. First, he argues that the instruction should have included the definition in subsection (B). We don't see why. The evidence did not show—and the government never argued—that Dessart's products qualified as "prescription drugs" because they were approved as such by the FDA. Second, Dessart argues that the

instruction should have included the definition of "prescription drug product" found in 21 U.S.C. § 379g. Again, we don't see why. Section 379g is part of the Prescription Drug User Fee Act of 1992, a discrete statutory scheme that collects user fees to help fund the FDA's review and approval of new drug applications. By its terms § 379g provides that its definition of "prescription drug product" applies "[f]or purposes of this subpart" only. There was no instructional error.

AFFIRMED.

POSNER, *Circuit Judge*, concurring. I agree with the decision but have reservations about some of the verbal formulas in the majority opinion. I do not criticize the majority for reciting them, because they are common, orthodox, even canonical. But they are also inessential and in some respects erroneous, and on both grounds ripe for reexamination.

First is the proposition that when a judge issues a warrant, whether to search or to arrest, the appellate court "must afford 'great deference' to the issuing judge's conclusion" that there was probable cause. *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008). This proposition derives from *Illinois v. Gates*, 462 U.S. 213, 236 (1983), where we are told that the Supreme Court has "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" Why *great* deference? Because, we're told in *Ornelas v. United States*, 517 U.S. 690, 698–99 (1996), "the Fourth Amendment demonstrates a 'strong preference for searches conducted pursuant to a warrant,' *Illinois v. Gates*, *supra*, 462 U.S. at 236, and the police are more likely to use the warrant process if the scrutiny applied to a magistrate's probable-cause determination to issue a warrant is less than that for warrantless searches. Were we to eliminate this distinction, we would eliminate the incentive."

This is a curious passage in three respects. First, why should a reviewing court accord "great" deference to a magistrate's determination of probable cause? The term "magistrate," often used in place of "judge" to designate the judicial officer who issues warrants, is an acknowledgment that warrants usually are issued by the most junior judicial officers—

and often police or prosecutors can shop among magistrates for one who is certain or almost certain to respond affirmatively to a request to issue a warrant. Second, the Fourth Amendment does not express a preference for searches conducted pursuant to warrants. Warrants are mentioned only in the amendment's second clause, which forbids general warrants and warrants not supported by both probable cause and an oath or affirmation. Nothing in the amendment requires warrants—ever.

And third, the proposition, whether or not correct, that police are more likely to resort to warrants if more deference is given to a magistrate's finding of probable cause than to an after-the-fact assertion by police or prosecutors that a search without a warrant is supported by probable cause implies confidence by the police that the magistrates from whom they seek warrants can be depended upon to find probable cause to issue the warrants. Otherwise warrants would be abjured. In short, the more warrants, the more searches because searches pursuant to warrants are less likely to be challenged than warrantless searches.

The passages from judicial opinions that I've quoted thus far invite judicial haste and carelessness. But wait a minute—I am objecting to propositions enunciated by the Supreme Court. That may seem impertinence on my part, forcing me to invoke the old proverb that "a cat may look at a king," one meaning of which is that an inferior is or should be allowed to criticize a superior.

Another reservation I have concerning the majority opinion in this case relates to the defendant's request that the district judge conduct a hearing (called a *Franks* hearing, see *Franks v. Delaware*, 438 U.S. 154 (1978)) to determine the like-

lihood that an agent had lied in the affidavit submitted to the magistrate in support of the agent's request for a warrant. The district court refused to hold a hearing, and in affirming the refusal our majority opinion says that "'determining the likelihood that [an investigator] lied in his warrant affidavit … involve[s] essentially the same process as fact-finding,' so our review of this issue, too, is deferential, for clear error only," quoting *United States v. Pace*, 898 F.2d 1218, 1227 (7th Cir. 1990). Doubtless the majority would also agree with the statement in *Pace* that "where the district court has reasonably and conscientiously reviewed the defendant's [claim for a hearing], and has properly applied the law, its decision should stand even if we, as an original matter, would have ordered the hearing." *Id.* This is a conventional appellate-court statement, but it's puzzling. What could it mean to say that the district court's decision "should stand even if we, as an original matter, would have ordered the hearing"? It could just mean that we haven't been given all the facts, and the district court was given all the facts, so its decision is more likely to be correct than ours would be. Or it could mean that the case is a toss-up and—rightly—a tie goes to the district court. Which is it? I'd like to know.

I am puzzled too by the remark in *Pace* that "even if de novo review is more likely to catch and correct more 'mistakes' by the district courts in denying *Franks* hearings, those mistakes do not go to a defendant's actual guilt or innocence. … [W]here mistakes do not go to guilt or innocence, de novo review imposes too great a cost for the benefits it might obtain." *Id.* There is first the question, which I'll leave for another day, what the terms "actual guilt" and "actual innocence" mean that "guilt" and "innocence" without the adjective "actual" do not mean. The next question is, when

there are mistakes that do not relate to the defendant's guilt or innocence, what reason could there be for paying *any* attention to them? A partial answer is that while a warrant procured by a lie is unlawful (it may violate a statute, or a judicial gloss that has been placed on the Fourth Amendment), it need not signal that the defendant is innocent of the crime with which he's charged—the crime that led to the application for a warrant. Yet one would have expected a dishonest application, being a serious procedural violation, to invite as close (or almost as close) judicial scrutiny as an erroneous conviction. Otherwise there are bound to be false convictions. Police who procure a search warrant by lying to the magistrate may also have no scruples against planting contraband in the house they are searching, or against pretending that the person they arrested had resisted arrest violently. It makes sense to exclude the fruits of such warrants even if in many cases the error doesn't imply that the defendant is innocent.

Three-fourths of the way through the majority opinion we read that "any challenge to the sufficiency of the evidence [that the defendant acted with 'deceptive intent'] comes with 'a heavy, indeed, nearly insurmountable burden,'" quoting *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010). To prevail, the defendant "must convince us that even after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Id*. I have trouble understanding why an appellant should have to overcome "a heavy," a "nearly insurmountable," burden of proof. Criticizing such hyperbole we said in *United States v. Curescu*, 674 F.3d 735, 741 (7th Cir. 2012), that "to say that a jury verdict can be set aside only if 'wholly irrational' (which would

indeed be a 'nearly insurmountable' proposition to establish) is the kind of hyperbole that sometimes creeps into opinions. … A jury verdict of guilt can be set aside—must be set aside—if, even though the verdict is not 'wholly irrational,' the evidence would not have justified a reasonable juror in finding guilt beyond a reasonable doubt."

And why is evidence in a criminal trial to be viewed "in the light most favorable to the prosecution"? It's been said that when an appellant "challenges the sufficiency of the evidence to convict him … by expressing his disagreement with the state trial judge's [or the jury's] decision to believe one of the eyewitnesses against him," we cannot reverse the conviction unless given some "basis to suppose that the trial judge was irrational to credit this witness's testimony." *Johnson v. Gramley*, 929 F.2d 350, 351 (7th Cir. 1991). Yet often the study of a trial transcript reveals not that the judge was irrational but that there was no basis for believing or disbelieving the witness—the judge was guessing, and while the guess was rational it can't realistically be thought to have determined guilt or innocence.

And why must a conviction be affirmed even if it is apparent that the trier of fact (judge or jury), while not irrational, was mistaken? Why in short are the dice so heavily loaded against defendants? And finally can the extraordinary burden placed on defendants be squared with the requirement (unchallenged) that a defendant must be proved guilty beyond a reasonable doubt in order to be convicted?

I also question the statement near the end of the majority opinion that "claims of [jury-]instructional error" are to be "review[ed] … for abuse of discretion," the term "abuse of discretion" being defined a few lines further along as includ-

ing, among other missteps, "material errors of law." Of course material errors of law are potentially very serious, but what has that to do with discretion or its abuse? Common as the term "abuse of discretion" is in opinions dealing with appeals from district court decisions, I find it opaque. If the appellate court is persuaded that the trial court erred in a way that makes the trial court's decision unacceptable, it reverses. What has discretion to do with it? And "abuse" seems altogether too strong a term to describe what may be no more than a disagreement between equally competent judges—the trial judge and the appellate judges—that the appellate judges happen to be empowered to resolve as they see fit.

To repeat what I said at the outset, I don't disagree with the decision to affirm the district court. I disagree merely with the rhetorical envelope in which so many judicial decisions are delivered to the reader. Judicial opinions are littered with stale, opaque, confusing jargon. There is no need for jargon, stale or fresh. Everything judges do can be explained in straightforward language—and should be.