In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 15-2766 & 15-2821

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CLARENCE NAGELVOORT and
EDWARD J. NOVAK,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 CR 312 — **Matthew F. Kennelly**, *Judge.*

ARGUED DECEMBER 7, 2016 — DECIDED MAY 12, 2017

Before WOOD, *Chief Judge,* BAUER, *Circuit Judge,* and
SHADID,[*] *District Judge.*

---

[*] Of the United States District Court for the Central District of Illinois,
sitting by designation.

BAUER, *Circuit Judge.* On March 25, 2015, after a seven-week trial, a jury convicted Edward Novak and Clarence Nagelvoort of knowingly and willfully causing Sacred Heart Hospital in Chicago, Illinois, to offer and pay kickbacks to physicians in return for patient referrals, in violation of 42 U.S.C. § 1320a–7b(b)(2)(A) (Anti-Kickback Statute), and conspiracy to do so in violation of 18 U.S.C. § 371. They now challenge their convictions on a number of grounds. For the reasons that follow, we affirm the convictions.

## I. BACKGROUND

On March 18, 2014, Novak and Nagelvoort were charged with participating in a scheme by which, from 2001 through 2013, Sacred Heart Hospital paid illegal kickbacks to physicians in exchange for referring patients to the Hospital. During that time, Novak was the owner of Sacred Heart and served as the President and Chief Executive Officer. Between August 2007 and April 2011, Nagelvoort worked as an outside consultant for the Hospital, and at various times during that period, he served as the Hospital's Vice President of Administration and Chief Operating Officer.

In 2011, federal agents began investigating and securing the cooperation of physicians and other Sacred Heart employees, some of whom began recording conversations with Sacred Heart administrators and physicians. On April 16, 2013, federal agents executed warrants authorizing the search of the Hospital and its administrative and storage facilities.

At trial, the government presented the audio recordings, testimony from cooperating physicians and staff, and documents gathered in the search as evidence that the Hospital paid

kickbacks to physicians by concealing them as payments under various types of contractual arrangements. The government's case focused on four types of agreements: (1) direct personal services contracts; (2) teaching contracts; (3) lease agreements for the use of office space; and (4) agreements to provide physicians with the services of other medical professionals.

### A. Personal Service Agreements With Physicians

Doctor Jagdish Shah, an oncologist, gained privileges and began seeing patients at Sacred Heart in 2000. At trial, Shah testified that in 2009, after another clinic where he was working closed, he told Novak that he could direct approximately 250 patients to Scared Heart. Novak said he was interested and directed Shah to speak with Nagelvoort about the arrangement. Shah relayed the same information to Nagelvoort, who then said he would speak with Novak. A couple days later, Novak called Shah and told him that there was a contract for him to pick up. Until that point, Shah had not discussed with Novak or Nagelvoort any specific additional services that Shah might provide the Hospital.

The contract provided that Shah would devote 20 hours per month to developing a cancer screening program and consult on oncology and hematology cases in exchange for a monthly payment of $2,000. Shah then met with Nagelvoort to explain that he would be unable to devote 20 hours per month to such work. Nagelvoort responded that Shah should "just sign the contract." Shah testified that he understood this to mean that he did not have to do the work required by the contract. It was his understanding that in exchange for $2,000

per month, he was required only to bring patients to Sacred Heart. Shah and Nagelvoort then signed the contract.

From July 2009 through January 2012, Shah submitted time sheets to Sacred Heart that showed he performed work and services that he did not actually perform. Shah testified that during that time period, he never spent 20 hours in one month performing any of the duties set forth in the contract. He also submitted time sheets showing time spent on services that were not outlined in the contract. Still, he received $2,000 every month.

In April 2012, Doctor Rajiv Kandala entered into an agreement with Sacred Heart to provide education to patients and staff regarding palliative care and hospice services. The contract provided that Kandala would be paid $175 per hour for up to 23 hours of such work per month. He submitted time sheets for the maximum number of hours each month and was paid the monthly maximum amount of $4,025. Numerous administrators and staff testified that there was no such palliative care educational or screening program at the Hospital. According to these witnesses, Kandala was rarely, if ever, seen at the Hospital. Additionally, some of Kandala's time sheets showed his attendance at meetings that did not occur on the dates recorded.

Between April 2012 and March 2013, Chief Operating Officer Anthony Puorro had numerous conversations with Kandala and Novak regarding Kandala's patient admission numbers. On at least three occasions, Puorro noted that Kandala's admission numbers were down and asked Kandala if he could increase the number of patients he sent to Sacred

Heart. In February 2013, after discussing Kandala's declining numbers, Novak suggested to Puorro that they take Kandala out and talk to him because "we need his patients over here."

### B. Teaching Contracts

Doctor William Noorlag was the Director of Sacred Heart's Podiatric Residency Program from 1999 to 2010. In 2001, Novak told Noorlag that he wanted to create paid teaching positions for podiatrists as a way to bring more podiatric patients to the Hospital. Noorlag testified that prior to creating these teaching contracts, the attending podiatrists at Sacred Heart already taught the residents as part of their regular duties, without any additional compensation. According to Noorlag, the attending physicians did not perform duties that justified additional teaching salaries. He also testified that in 2008 or 2009, Novak instructed him that there must be evaluations and other paperwork to justify the contracts, and explained, "If I go down for this, you're going down with me."

In late 2001, Sacred Heart entered into a teaching contract with Doctor Richard Weiss. At trial, Weiss testified that when he first met with Novak to discuss a teaching contract, it was Weiss' understanding that Sacred Heart would be compensating him for bringing surgical cases to the Hospital. There was no discussion at that meeting of Weiss' qualifications or any details of the residency program. Weiss and Novak eventually signed a contract, under which Weiss would receive $2,000 per month for teaching and performing various other services related to the residency program. From 2002 through 2008, Weiss received his monthly salary from Sacred Heart, but performed none of the services listed in the teaching contract.

Instead, he simply allowed residents to observe his surgeries in the same manner he had done, without additional compensation, before signing the contract.

In November 2006, Novak signed a contract with Doctor Shanin Moshiri, which contained the same duties as Weiss' contract, and stated that Moshiri would be the "Director of External Office Rotations" for the residency program. Noorlag, the Director of the program, testified that he did not consider Moshiri to hold that position and that another podiatrist was, in fact, in charge of arranging external rotations for the residents. Like Weiss, Moshiri was paid $2,000 per month under the contract. According to Noorlag, Moshiri did not perform the duties outlined in his contract and his instruction of residents was limited to allowing them to observe and participate in surgical procedures. Additionally, records showed that other attending podiatrists who were not compensated under teaching contracts had significantly more contact with residents than Moshiri did.

In May 2010, Nagelvoort drafted a teaching contract for Doctor Subir Maitra, which mirrored the contracts for Weiss and Moshiri. Under the contract, Sacred Heart would pay Maitra $2,000 per month to serve as a faculty member of the Hospital's "Medical Student Program." At this time, there was already a medical student program at the Hospital, which was run by an outside organization called Affiliated Institute for Medical Education (AIME). This organization independently paid physicians to allow medical students to rotate with them. Maitra received his teaching compensation from Sacred Heart, not AIME.

Students who rotated with Maitra were to record their time in a logbook, which Maitra was then required to sign. Nagelvoort directed his assistant to maintain this logbook. At Maitra's request, he was allowed to sign blank log sheets, which were to be filled in later by the students. By June 2012, students stopped recording their time altogether, but Maitra's signature continued to appear on blank logs. Sacred Heart continued to pay Maitra under the contract through April 2013. During a meeting with Puorro in February 2013, Puorro told Maitra that Novak wanted to know how many patients Maitra was referring to the Hospital. Maitra responded: "Every month, I'm bringing at least three to four insurance cases … . He should be giving me more [money], a little bit." There was no discussion during that meeting of any of Maitra's teaching duties under his contract.

### C. Lease Agreement

In March 2004, Novak signed a lease to rent space from Doctor Percy Conrad May, Jr. at the May Medical Center. Sacred Heart agreed to pay $5,000 per month to rent three exam rooms, the clinic's pharmacy, and its waiting area. In December 2009, Nagelvoort signed an addendum to this lease, lowering the monthly payment to $2,000, with no changes to the other terms. At trial, Noorlag testified that in 2006, Ed Lorgeree, the Chief Operating Officer, explained to him that this lease was established so that May would refer podiatry patients to Sacred Heart. In April 2012, during a recorded conversation, Chief Financial Officer, Roy Payawal noted that when the rent was $5,000, "we were getting five or six referrals a month," but when the rent was reduced, May's referrals "dried up." In September 2012, prior to his coopera-

tion, Puorro was recorded stating: "[May]'s getting 2,000 dollars a month … . That's his check, and ah, it's in exchange for continuing his relationship. It's a quid pro quo. We expect admissions to be sent to Sacred Heart Hospital, otherwise it doesn't make any financial sense for us."

### D. Agreements for Services of Other Medical Professionals

In early 2009, Nagelvoort discussed with the Director of Nursing, Deborah Savage, an arrangement whereby the Hospital would hire physician's assistants (PAs) for some of their attending physicians. At trial, Savage testified that Nagelvoort explained that this arrangement would create an incentive for physicians to refer patients to the Hospital.

Savage's successor, Michael Castro, also testified that he had multiple meetings in 2010 and 2011 with Novak, Nagelvoort, and the Director of Respiratory Practice, Ernie Velasquez. During those meetings, Nagelvoort explained that the Hospital needed to provide Doctor Ventkateswara Kuchipudi with a PA in order to obtain more patient referrals from him. In a conversation recorded in February 2013, Velasquez explained the arrangement:

> When Clarence [Nagelvoort] wanted to get Kuchipudi here, … Kuchipudi said I can bring the patients in, but I need some help. Clarence thought about this program, which was a program whereby the Hospital is gonna hire the PAs … . You will make money and guarantee that your patient will be protected, that it's not

> gonna be stole from you, and we make money
> from the Medicare admission.

Doug Willaman began working as a PA at Sacred Heart in February 2009. Shortly thereafter, Willaman had a meeting with Doctor Shah and Nagelvoort. Willaman testified that during that meeting, Nagelvoort told Shah that Willaman would provide services for Shah's patients both at the clinic and the Hospital, and in return Nagelvoort expected Shah to refer five to ten patients per month to Sacred Heart. Willaman saw patients at Shah's clinic between February 2009 and December 2010, and was paid a salary by the Hospital, but was never compensated by Shah.

Joanna Swajnos began working as a PA at Sacred Heart in November 2009. In December 2009, Nagelvoort assigned Swajnos to work at May's clinic treating his patients for two and a half days per week. May did not compensate Swajnos for her work, but did bill for the services she provided his patients. Sacred Heart paid Swajnos' salary and did not bill for her services. In July 2010, Debra Savage asked Roy Payawal for May's admission numbers. She testified that she thought Swajnos was needed more at the Hospital than at May's clinic, but that if May was bringing enough admissions to the Hospital, she would keep Swajnos at the clinic in some capacity. Between January and July 2010, May had admitted four patients to the Hospital. After she received that information and discussed it with Nagelvoort, Nagelvoort made the decision to recall Swajnos from the clinic.

Beginning in 2010, Nagelvoort assigned Swajnos, Willaman, and nurse practitioners (NPs) Jean Rush and Myrline Jeudy to

assist Doctor Kuchipudi with his patient care. They worked with Kuchipudi's patients both in the Hospital and at various nursing home facilities. Swajnos, Rush, and Jeudy each testified that they spent at least 90% of their time working with Kuchipudi's patients and understood him to be their boss. Kuchipudi never paid Rush and Jeudy, who received all of their compensation from the Hospital. From March 2011 to April 2013, Swajnos received between 25% and 30% of her compensation from Kuchipudi, but estimated that, during that period, 60% of her time was devoted to his patients. She still received her full salary from the Hospital, as well. In a recorded conversation in March 2013, regarding these arrangements, Payawal explained: "I think that was the main reason, uh, we created that, uh, PA to do … the work for uh, the doctor, and particularly Kuchipudi. Because I don't think he will come here, if that was not set up for him." In this same conversation, Payawal also confirmed that Nagelvoort set up these arrangements and that Novak knew about them.

On numerous occasions, Novak and Nagelvoort conferred with Sacred Heart's outside counsel, Joan Lebow, when creating these arrangements. Lebow testified that Nagelvoort told her that the Hospital intended to employ the PA or NP full time, but only use them at the Hospital 70% of the time and sell the balance of the time to attending physicians for market value. Upon that information, Lebow drafted a memorandum in August 2010, in which she advised that the relationship did not fit into any of the safe harbor provisions of the Anti-Kickback Statute, but that it might not violate the law so long as referral inducement was not a purpose of the arrangement. Nagelvoort responded to the memorandum in an email by first

explaining that he had discussed it with Novak. Among other suggested revisions to the memorandum, Nagelvoort requested that Lebow "remove bullet point three as it refers to referrals!!! [P]lease delete this."

For the next few months, Lebow continued to confer with and provide advice to Novak and Nagelvoort regarding these arrangements. In February 2011, another memorandum from Lebow reiterated that when the PAs and NPs were working at the Hospital, only the Hospital was allowed to bill for the services, not the attending physician. Lebow stated that allowing a PA or NP to work for a physician while the PA or NP was working a shift at the Hospital could be considered an illegal inducement for referrals.

### E. Indictment, Trial, and Post-Trial Motions

On March 18, 2014, Novak and Nagelvoort were charged in a superseding indictment with violating 42 U.S.C. § 1320a–7b(b)(2)(A), and conspiring to do so in violation of 18 U.S.C. § 371. Novak was charged with 27 substantive counts of violating the Anti-Kickback Statute and Nagelvoort was charged with 10 such counts. After a seven-week trial, the jury found both Novak and Nagelvoort guilty of the conspiracy count, and all but one of the substantive counts with which they were charged.

At trial, and in post-trial motions, Novak and Nagelvoort argued that there was insufficient evidence to prove that they acted with the requisite knowledge and willfulness under the statute. They also argued that the government failed to prove that certain of the agreements fell outside the statute's safe harbor provisions. Nagelvoort separately argued that he

withdrew from the conspiracy when he resigned his position at Sacred Heart on April 28, 2011, and as such, any coconspirator statements made after that date were not admissible against him.

The district court rejected these challenges. It held that there was sufficient evidence for the jury to find that Novak and Nagelvoort acted knowingly and that the contracts did not fall within any of the statute's safe harbors. The court also affirmed its ruling that Nagelvoort had not proven his withdrawal as a matter of law.

## II. DISCUSSION

On appeal, both Novak and Nagelvoort argue that the government did not present sufficient evidence to support their convictions for violating the Anti-Kickback Statute. Nagelvoort also challenges the district court's rulings and jury instruction regarding his withdrawal from the conspiracy. Finally, Nagelvoort argues that the Anti-Kickback Statute is unconstitutionally vague as applied to him.

### A.  Sufficiency of the Evidence

Novak and Nagelvoort make two challenges to the sufficiency of the evidence. First, they argue that the government failed to present sufficient evidence that the agreements at issue fell outside of the statute's safe harbor provisions. Then, they contend that there was insufficient evidence for the jury to determine that they knowingly or willfully violated the Anti-Kickback Statute.

When reviewing a challenge to the sufficiency of the evidence, "we view the evidence in the light most favorable to

the prosecution and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Salinas*, 763 F.3d 869, 877 (7th Cir. 2014) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not reweigh the evidence nor judge the credibility of witnesses. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000). "As long as there is a reasonable basis in the record for the jury's verdict, it must stand." *Id.* (citation omitted).

Under 42 U.S.C. § 1320a–7b(b)(2)(A), it is a felony to knowingly or willfully pay any remuneration, directly or indirectly, to refer a person for a service for which payment may be made, in whole or in part, under a federal health care program. The statute's corresponding regulations provide certain "safe harbors" that protect from liability payments made pursuant to personal services contracts and rental agreements if they satisfy specific criteria. *See* 42 C.F.R. § 1001.952(b) and (d). Generally, the safe harbors exempt written agreements for space rental and personal services if the terms are for less than a year; the compensation is consistent with fair market values; and the services or space are reasonably necessary to accomplish the business goals of the contracting entity. *Id.* These safe harbors, however, do not protect any payment that "takes into account the value or volume of any referrals" for services to be paid for under a federal health care program. *Id.* § 1001.952(b)(5) and (c)(5).

The jury was properly instructed on the application of these safe harbor provisions, and Novak and Nagelvoort do not contend otherwise. Instead, they simply argue that the jury's conclusions were incorrect because the evidence showed that the leases, personal service contracts, and teaching agreements

met each of the elements of the respective safe harbor. However, there was ample evidence from which the jury could determine that the arrangements at issue "[took] into account the value or volume of any referrals" from the doctors.

Doctor Shah signed a contract to spend 20 hours per month developing a cancer screening program at the Hospital in exchange for $2,000 per month. Shah testified that it was his understanding that he was not actually required to perform the work outlined, and instead, was required only to bring patients to Sacred Heart. Additionally, multiple witnesses testified that Kandala was rarely at the Hospital, despite his time sheets showing that he spent 23 hours per month providing education on palliative and hospice services. The jury also heard recorded conversations between Kandala, Puorro, and Novak discussing Kandala's declining referral numbers, as well as Novak's desire to make Kandala happy because "we need his patients over here." Based on this evidence, a reasonable jury could conclude that the agreements took into account the physician's potential referrals, thereby placing them outside the safe harbor.

As to the teaching contracts, Doctor Noorlag testified that the attending podiatrists were already teaching residents as part of their normal duties before the creation of separate teaching contracts. He said there were no additional duties created that would have justified the additional payments made under the contracts. Doctor Weiss, who had one such contract, testified that it was his understanding he was being compensated for bringing surgical cases to the Hospital. The jury heard testimony indicating that Doctors Moshiri and Maitra were paid pursuant to these contracts, but did not

perform all of the corresponding duties. The jury also heard a conversation between Maitra and Puorro, during which Maitra referenced the number of referrals he had made and that he thought the Hospital should be paying him more.

Finally, the evidence regarding the lease agreement with Doctor May also supported the jury's conclusion. Puorro was recorded stating that the arrangement with May was "a quid pro quo. We expect admissions to be sent to Sacred Heart Hospital, otherwise it doesn't make financial sense for us." Clearly, this indicates the consideration of May's potential referrals.

The evidence summarized here, and outlined in more detail above, when viewed in the light most favorable to the prosecution, certainly could have lead a reasonable jury to find that the agreements took into account the referrals that the doctors would make to Sacred Heart. Thus, because there was a reasonable basis for the jury to conclude that the contracts were not protected by the safe harbors, that conclusion must stand. *See Galati*, 230 F.3d at 258.

Next, Novak and Nagelvoort contend that the evidence presented at trial was insufficient to prove that they knowingly or willfully violated the Anti-Kickback Statute when they entered into the arrangements at issue. Again, however, there was sufficient evidence from which the jury could have concluded that both appellants knew the contracts were illegal.

As an initial matter, the government presented evidence that Novak and Nagelvoort had knowledge of the Anti-Kickback Statute, its purpose, and its prohibitions. The jury heard that both men were involved in the Hospital's Corporate

Compliance Program, which produced a manual that discussed these very issues. Additionally, Sacred Heart's outside counsel Joan Lebow testified that she discussed the statute with appellants and counseled them on its provisions. The jury saw numerous memoranda from Lebow to Novak and Nagelvoort wherein she clearly set forth the types of arrangements the statute prohibits.

Having established their knowledge of the statute, the government also presented ample evidence indicating that both Novak and Nagelvoort played significant roles in the creation and oversight of the arrangements at issue. Novak signed the lease agreement with May, the initial contract with Moshiri, and the teaching contracts with Weiss and Maitra. He also reviewed and signed mileage requests submitted by Szwajnos for her travel to and from May's and Kuchipudi's clinics. Nagelvoort signed the second agreement with Moshiri, the contract with Shah, and the amendment to May's lease agreement.

In addition, Noorlag, the Director of Podiatric Residency, testified that Novak sought his input in creating and drafting the language of the teaching contracts. Weiss testified that, after a discussion with Novak, it was his understanding that his teaching contract was a means for compensating him for bringing surgical cases to the Hospital. Noorlag also testified that Novak directed him to create paper files justifying the teaching agreements, and explained to Noorlag, "if I go down for this, you're going down with me."

As further evidence of their knowledge, Shah testified that he discussed bringing patients to Sacred Heart with both

Novak and Nagelvoort before he was offered a contract to develop a Cancer Screening Program. He told Nagelvoort he could not devote the amount of time the contract required, and Nagelvoort told him to "just sign the contract." Shah testified that, based on these conversations, he believed his only obligation was to bring patients to the Hospital. Savage testified that Nagelvoort told her that the provision of PAs and NPs would create an incentive for physicians to refer their patients to Sacred Heart. She also testified that Nagelvoort oversaw this program and assigned the professionals to particular physicians. Payawal stated in a recorded conversation that Nagelvoort was responsible for creating these arrangements and that Novak had knowledge of them. All of this evidence could lead a reasonable jury to conclude that Novak and Nagelvoort knew that they were compensating doctors for referrals.

Finally, documents showed that Novak and Nagelvoort provided Lebow with false and incomplete information when seeking her counsel on the legality of these arrangements. On multiple occasions, and after consulting with Novak, Nagelvoort informed Lebow that the individual physicians would compensate the PAs and NPs provided to them, when in fact, the Hospital paid those professionals. Nagelvoort also told Lebow that the Hospital alone would be billing for the PAs' and NPs' services, which was not true. From that evidence, a reasonable jury could make the inference that Novak and Nagelvoort knew the arrangements were illegal, but provided false information so as to obtain a record of approval from their outside counsel.

Both Novak and Nagelvoort argue that their numerous consultations with Lebow showed their intent to ensure the contracts were legal. Novak similarly argues that many of the recorded conversations the government presented were, in fact, exculpatory. He contends that these conversations show that he was attempting to follow the law and, therefore, cannot be found to have knowingly or willfully violated the Anti-Kickback Statute. For example, in some of these recordings, Novak is heard directing others to make sure that the arrangements were "kosher" and that employees and physicians were documenting the work that was required under the contracts.

However, the jury heard and rejected these arguments. Instead, it accepted the government's theory that these conversations indicated that Novak and Nagelvoort knew these arrangements were illegal and that they were attempting to cover their tracks. This is a reasonable inference based upon all of the evidence presented, and it is not for us to decide that the jury was wrong to accept it. *See Galati*, 230 F.3d at 258 (we will not reweigh evidence if there is a reasonable basis in the record for the verdict); *see also United States v. Hale*, 448 F.3d 971, 984–85 (7th Cir. 2006) (where there are competing views of the evidence, "[w]e will not substitute our judgment for the jury's").

In sum, there was sufficient evidence, when viewed in the light most favorable to the government, for the jury to conclude that both Novak and Nagelvoort violated the Anti-Kickback Statute knowingly or willfully.

### B. Nagelvoort's Challenge to Admission of Coconspirator Statements

Nagelvoort's employment with Sacred Heart ended on April 28, 2011, when he went to Novak and asked to be terminated. The next day, Novak sent a notice to all the department managers at the Hospital informing them that Nagelvoort was no longer associated with Sacred Heart. Nagelvoort never returned to the Hospital and did not receive any payments or benefits after that date.

Nagelvoort argues, therefore, that he withdrew from the conspiracy on that date, and any coconspirator statements or conduct occurring after April 28, 2011, should have been held inadmissible against him. He requested such an instruction at trial, which the district court denied. Instead, the court instructed the jury that if it found that Nagelvoort showed "that it's more likely than not that he withdrew from the alleged conspiracy as of April 28, 2011, then you may not consider as evidence against him any statements made by any alleged coconspirators after that date."

We review a district court's decision to admit coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) for an abuse of discretion. *United States v. Pust*, 798 F.3d 597, 602 (7th Cir. 2015) (citation omitted). Any relevant findings of fact are reviewed for clear error. *Id.*

Under Rule 801(d)(2)(E), statements of a coconspirator are admissible against a party if the party was a member of the conspiracy and the statements were made during the course and in furtherance of the conspiracy. *United States v. Powers*, 75 F.3d 335, 339 (7th Cir. 1996) (citation omitted). Thus, if

Nagelvoort was no longer a member of the conspiracy after
April 28, 2011, the coconspirator statements made after that
date would not be admissible against him under that rule. It is
the defendant's burden to prove that he withdrew from the
conspiracy. *United States v. Hall*, 212 F.3d 1016, 1023 (7th Cir.
2000). Ceasing one's active participation in the conspiracy, by
itself, is not sufficient to prove withdrawal. *United States v.
Vallone*, 752 F.3d 690, 697 (7th Cir. 2014) (citation omitted).
Withdrawal requires an "'affirmative action … to disavow or
defeat the purpose' of the conspiracy." *Smith v. United States*,
133 S. Ct. 714, 720 (2013) (quoting *Hyde v. United States*, 225 U.S.
347, 369 (1912)).

Nagelvoort argues that by his termination from Sacred
Heart and Novak's communication of that fact to the Hospi-
tal's managers, he effectively withdrew from the conspiracy as
a matter of law, and therefore, any coconspirator statements
after his termination were inadmissible against him. He does
not contend that he took any other affirmative actions toward
withdrawal, nor does he argue that any such actions would
have been necessary. As support, Nagelvoort cites to a number
of cases from our sister circuits, in which the courts have found
that ending one's relationship with a company was sufficient
to establish withdrawal from a conspiracy occurring within
that company. *See, e.g.*, *Morton's Mkt., Inc. v. Gustafson's Dairy,
Inc.*, 198 F.3d 823, 838–39 (11th Cir. 1999), *amended in part*, 211
F.3d 1224 (11th Cir. 2000); *United States v. Nerlinger*, 862 F.2d
967, 974–75 (2d Cir. 1988); *United States v. Steele*, 685 F.2d 793,
803–04 (3d Cir. 1982).

Our cases, however, require something more. We have held
consistently that simply ending one's involvement in the

conspiracy, even voluntarily, is not enough to constitute withdrawal. *See, e.g.*, *Vallone*, 752 F.3d at 697 (defendant did not withdraw where he did not perform an affirmative act "to defeat or disavow the unlawful goal of the conspiracy"); *United States v. Morales*, 655 F.3d 608, 640 (7th Cir. 2011) ("neither retirement from an organization nor mere inactivity constitutes effective withdrawal" without affirmative act to disavow the criminal objective); *United States v. Julian*, 427 F.3d 471, 483 (7th Cir. 2005) (same). Here, there was no evidence presented at trial, nor does Nagelvoort now contend, that he took any additional action aimed at defeating or disavowing the objectives of the conspiracy. The termination of Nagelvoort's employment alone does not constitute withdrawal.

Nagelvoort points out that in *United States v. Wilson*, we held that "communication by the defendant of the fact of his withdrawal in a manner designed to reach his coconspirators" can suffice as proof of withdrawal. 134 F.3d 855, 863 (7th Cir. 1998). He argues that his request to be terminated and the notice Novak sent to the Hospital managers constitutes such a communication. We clarified that holding, however, in *Vallone*, where the defendant made a similar argument. *United States v. Vallone*, 698 F.3d 416, 494 (7th Cir. 2012), *vacated on other grounds sub nom.*, *Dunn v. United States*, 133 S. Ct. 2825 (2013), *opinion modified and reinstated*, *Vallone*, 752 F.3d 690. Expanding on the language in *Wilson*, we held that "in order to effectuate legally meaningful withdrawal from the conspiracy, the defendant's announcement must also disavow the conspiracy and its criminal objectives." *Id.* (internal quotation marks and alteration omitted). Nagelvoort made no such disavowal. He simply expressed his desire to end his employment at the

Hospital. Thus, we agree with the district court's finding that Nagelvoort had not carried his burden of proving that he had withdrawn from the conspiracy as a matter of law. The court did not abuse its discretion, therefore, when it allowed the coconspirator statements into evidence and denied the limiting instruction Nagelvoort requested.

Nagelvoort then attempts to argue that, despite the court's findings, he was prejudiced by the court's decision to allow the jury to consider the issue of withdrawal. We fail to see any prejudice this may have caused. Based on the court's instruction, the jury could have determined that Nagelvoort had withdrawn, in which case any statements after April 28, 2011, could not be considered against him. Particularly in light of the court's finding that he had not proven withdrawal as a matter of law, we fail to see how Nagelvoort was prejudiced by allowing the jury the opportunity to make a contrary factual finding. If anything, it appears that he only could have benefitted from the instruction. Therefore, we do not find any error in the court's instruction.

## C. Constitutionality of Anti-Kickback Statute

Finally, Nagelvoort contends that this Court's interpretation of the Anti-Kickback Statute renders it unconstitutionally vague. Specifically, Nagelvoort takes issue with the district court's instruction, and the government's argument to the same effect, that the statute is violated if "any part or purpose" of a payment or remuneration was to induce referrals to the Hospital.

We review issues of statutory interpretation *de novo*. *United States v. Ford*, 798 F.3d 655, 661 (7th Cir. 2015) (citation omit-

ted). A challenge to a statute's constitutionality is also reviewed *de novo*. *United States v. Sylla*, 790 F.3d 772, 774 (7th Cir. 2015) (citation omitted).

A statute is unconstitutionally vague if it: "(1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) fails to provide explicit standards to prevent arbitrary discriminatory enforcement by those enforcing the statute." *United States v. Plummer*, 581 F.3d 484, 488 (7th Cir. 2009) (citation omitted). Unless the vagueness challenge implicates the First Amendment, which is not the case here, the statute is analyzed as applied to the specific facts of the case. *Id.*

Nagelvoort argues that by allowing the jury to find a violation if "any part or purpose" of the payments was meant to induce referrals, the statute is unconstitutionally vague. He contends that "every contractual relationship a Hospital has with a doctor" might run afoul of the statute with such an interpretation, and that one could not know in advance whether a particular arrangement might be deemed illegal by a prosecutor. He urges us, therefore, to overturn our precedent and adopt an interpretation (also set forth in his proposed jury instruction) that a payment or remuneration violates the Anti-Kickback Statute only if its "primary or substantial purpose" is to induce referrals.

We considered, and rejected, an almost identical theory in *United States v. Borrasi*, 639 F.3d 774, 781–82 (7th Cir. 2011). In fact, Nagelvoort relies on the same case, *United States v. Bay State Ambulance & Hospital Rental Serv., Inc.*, 874 F.2d 20 (1st Cir. 1989), to support his argument as the defendant in *Borassi*

did. In *Bay State*, the First Circuit affirmed convictions after the district court instructed the jury that defendants were guilty only if payments were made "primarily as [referral] inducements." 874 F.2d at 30. That case did not persuade us in *Borassi*, and instead, we followed the holdings of the Third, Fifth, Ninth, and Tenth Circuits on this issue. *See Borrasi*, 639 F.3d at 782 (collecting cases). We held that "if part of the payment compensated past referrals or induced future referrals," it constitutes a violation of the Anti-Kickback Statute. *Id.*

We see no reason to overturn *Borassi* and alter that interpretation now. We reject Nagelvoort's contention that our interpretation of the statute criminalized his otherwise "innocent, legitimate business arrangements and conduct." As we said in *Borrasi*, "nothing in the [Anti-Kickback Statute] implies that only the primary motivation of remuneration is to be considered in assessing" the conduct at issue. *Id.* We hold, therefore, that the Anti-Kickback Statute is not unconstitutionally vague as applied to Nagelvoort's case.

### III. CONCLUSION

For the foregoing reasons, we affirm the convictions of both Novak and Nagelvoort.