NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Argued July 7, 2020
Decided July 14, 2020

Before

DIANE S. SYKES, *Chief Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 19-1212

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

    *v.*

DETRICK LAYFIELD,
    *Defendant-Appellant.*

Appeal from the United States District Court for the Southern District of Illinois.

No. 17-CR-30174-MJR
Michael J. Reagan, *Judge.*

## Order

A jury convicted Detrick Layfield of assault with a dangerous weapon, with intent to do bodily harm, while he was a federal prisoner, and of two additional offenses. See 18 U.S.C. §§ 113(a)(3), 1512(c)(1), 1791(a)(2). The judge sentenced him to 92 months' imprisonment. His sole argument on appeal is that the evidence does not support the conviction on the dangerous-weapon charge, because none of the witnesses testified that they saw the whole weapon when Layfield wielded it.

At trial Scott Dilley testified that Layfield attacked him in his cell over an unpaid debt. He related that Layfield said: "[W]ell, I got something for you, you … coward" and then "pulled out a weapon" and continued an attack that began with an exchange of punches. Though Dilley did not see the entire weapon because the attack happened "so fast," he saw a gray "triangle-shape[d]" tip "like" the one atop the shank the government offered into evidence. As the prosecutor played a video recording of the attack, Dilley narrated that Layfield was "stabbing" at him. (Because of the inmates' distance from the cameras, the recordings do not show whether Layfield had a weapon.) Dilley suffered a 1.25-inch laceration to his right arm, about a quarter inch wide and deep.

The nurse who examined Dilley testified as an expert. He opined that it was "unlikely" that this gash was caused by hitting an object such as his cell's locker, because the soft tissue there "would normally absorb impact" and not rip open.

Two other inmates testified that they had attempted to dispose of the shank. Damion Phipps, who observed only the end of the fight, did not see Layfield use a knife. But Phipps testified that, immediately after the fight, Layfield came to his cell and asked him to "get rid" of the knife that Layfield was holding. After Layfield dropped the knife on his floor and left, Phipps asked another inmate, Demarcus Spraggins, to assist. Spraggins testified that he took the knife and put it in the bottom of a dryer in the laundry room. While he saw only the end of the fight and did not see Layfield use a weapon, Spraggins identified the knife offered at trial as the one Phipps had asked him to hide. He had seen Layfield with the same knife two weeks before the assault.

Prison officers testified about their investigation of the incident and retrieval of the weapon. Officer Joseph Serio stated that, in an afternoon interview days after the incident, Spraggins described the shank to Serio and told him where to find it. Serio testified that he then told Matthew Shute, another officer, where the shank was, and Shute retrieved it that afternoon.

Shute testified differently. He said that he had retrieved the shank from the dryer in the morning, based on Serio's interview of Spraggins. He also testified that he found three weapons in the laundry but presented only one to Serio and Spraggins; the other two weapons did not resemble Spraggins's description. The officers submitted the weapon for DNA and fingerprint analysis, but the results were inconclusive.

Layfield argues that the evidence was insufficient in three respects. First, neither Dilley nor the other witnesses saw Layfield use a knife during the attack, so they could not be sure that the knife shown at trial was the one that Layfield used. Second, officers Shute and Serio testified inconsistently about when Shute found the weapon in the dry-

er, thereby "undermin[ing] the investigation of its discovery." Third, the case against him lacked DNA and fingerprint evidence, and the video was inconclusive.

"Any challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable, burden." *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018) (quoting *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016)). We view the evidence "in the light most favorable to the prosecution" and "do not reweigh the evidence nor judge the credibility of witnesses." *United States v. Nagelvoort*, 856 F.3d 1117, 1125 (7th Cir. 2017). "As long as there is a reasonable basis in the record for the jury's verdict, it must stand." *Ibid*. (quoting *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000)).

The record contains ample evidence supporting the jury's verdict that Layfield used a dangerous weapon in his fight with Dilley. From Dilley's testimony that Layfield was "stabbing" at him and that the tip of the weapon was "like" the one on the shank shown at trial, a rational jury could find that Layfield stabbed Dilley with it, even if Dilley could see only its tip. Right after the attack, Layfield dropped a knife (which Phipps identified at trial) in Phipps's cell and asked Phipps to "get rid" of it for him. Reasonable jurors could infer that Layfield had just used it in the fight, even though Phipps did not see that use. Moreover, Spraggins confirmed that the knife that Phipps identified at trial was the one Phipps asked him to hide. Both accounts allowed the jury to infer that Layfield used it in the fight. Finally, the jury reasonably could find that the knife was dangerous. It saw the photo of the inch-long laceration, a slash that the nurse who examined Dilley opined was "unlikely" to have come from hitting objects in his cell.

Layfield observes that Shute and Serio had different recollections about the time of day that Shute learned of and discovered the knife. But the jury was entitled to decide that this inconsistency did not diminish their credibility about other aspects of the discovery. Layfield's final observation that the record lacks DNA, fingerprint, or conclusive video evidence is merely an argument that the case might have been stronger; it is not an argument that the eyewitness testimony of the victim and two fellow inmates was deficient.

AFFIRMED